Isabella Eldridge (Utah Bar No. 19517)
BLUERIBBON COALITION, INC
PO Box 76
New Plymouth, ID 83655
Telephone: (405) 464-9060
Email: bella.eldridge@blueribboncoalition.org

*Attorney for BlueRibbon Coalition, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| BLUERIBBON COALITION, INC.; SAGE RIDERS MOTORCYCLE CLUB; and PAUL WELLS | **COMPLAINT** |
| Plaintiffs, | Case No. 2:25-cv-00164 |
| vs. | Honorable _____ |
| BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR | |
| Defendants. | |

Plaintiffs BlueRibbon Coalition, Inc., Sage Riders Motorcycle Club, and Paul Wells seek relief from this Court against Defendants Bureau of Land Management and the United States Department of the Interior and would show the Court as follows:

### INTRODUCTION

1. This lawsuit challenges the route closures established by Defendants' approval of the San Rafael Swell Travel Management Plan/Final Environmental Assessment, and the associated Decision Record (DOI-BLM-UT-G020-2019-0019-EA). The final decision selected an alternative that contradicts public input, does not fit into any of BLM's proposed alternatives, and closes an

1

additional 665 miles of an already-atrophied motorized recreation system due to Congressionally designated wilderness areas enveloping the area.

2. These route closures result in a myriad of problems. These include creation of *de facto* wilderness expansion, denial of access to historical sites, denial of access to State Issued Trust Land ("SITLA"), and closures based on arbitrary and capricious reasoning. Plaintiffs expressed concern about each of these problems from the outset through their comments. The EA did not adequately address these concerns.

3. The San Rafael Swell Travel Management Area ("TMA") is well-known for its spectacular landscapes which include canyons, arches, and mesas. Due to this rare scenery, it is the region's "most well-known and popular scenic attraction" that draws in "high levels of recreation visitation."[1] As such, the beauty and recreational value of the area has led to the TMA becoming a bucket-list destination for many.

4. On December 4, 2024, Plaintiff BlueRibbon, pursuant to 40 C.F.R. §78.5, sent via certified mail a letter to the BLM's Price Field Office Manager, and the BLM's Utah State Director, raising the issue of the new precedent out of the D.C. Circuit which held that the Council on Environmental Quality ("CEQ") has no authority to issue regulations implementing the National Environmental Policy Act ("NEPA"), thus rendering CEQ's NEPA regulations invalid and ineffective.[2] Because of the reliance on CEQ's NEPA guidelines in implementing the TMP and EA, BlueRibbon requested BLM stay the San Rafael Swell TMP until more guidance is provided on how agencies are to proceed under the new precedent. Ex. B at B-1 ("BRC Letter").

---

[1] *See* Bureau of Land Management, *San Rafael Swell Travel Management Plan Environmental Assessment*, DOI-BLM-UT-G020-2019-0019-EA at 4 (Dec. 2024).
[2] *See Marin Audubon Society v. FAA, No. 23-1067 (D.C. Cir. 2024).*

5. Defendants never replied, and the final decision was released 27 days later.[3] Since the Decision was released, the CEQ has been under great scrutiny. A District Court in North Dakota reaffirmed the D.C. Circuit's decision.[4] President Trump also issued Executive Order 14154, "Unleashing American Energy," which recognizes the invalidity of CEQ implementing regulations and requires that agencies, including the Department of the Interior, must enact new regulations that do not suffer from the same deficiencies as the CEQ NEPA regulations.[5] Finally, on February 19, 2025, the CEQ Director for NEPA, Jomar Maldonado Vazquez, signed a notice titled "Removal of National Environmental Policy Act Implementing Regulations" ("notice"), an interim rule, which removed CEQ's regulations implementing NEPA and outlined how agencies are to proceed going forward.[6] This is why Plaintiffs sent the certified letter alerting BLM to potential future issues under CEQ regulations.

6. Plaintiffs allege that Defendants' motorized restrictions and route closures in the TMA are ultra vires, arbitrary and capricious, and a violation of federal law.

7. Plaintiffs ask this Court to find Defendants' actions unlawful; and to set aside the TMP.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. §§ 2201-02 (declaratory judgment); and the Administrative Procedure Act ("APA") 5 U.S.C. §§ 701-06. These claims arise under the Dingell Act, 16 U.S.C. § 1132 et seq., P. Law 116-9; the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332(2)(C); and

---

[3] BLM acknowledged the new precedent in their final Environmental Assessment: "To the extent that a court may conclude that the Council on Environmental Quality (CEQ) regulations implementing NEPA are not judicially enforceable or binding on this agency action, the BLM has nonetheless elected to follow those regulations at 40 C.F.R. Parts 1500-1508, in addition to the DOI's procedures/regulations implementing NEPA at 43 C.F.R. Part 46, to meet the agency's obligations under NEPA, 42 U.S.C.§§ 4321 et seq." EA at 11.
[4] Order, *State of Iowa v. Council on Env't Quality*, No 1:24cv00089 (D.N.D. Feb. 3, 2025), ECF No. 145.
[5] *See* https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/
[6] *See* https://ceq.doe.gov/docs/laws-regulations/CEQ-Interim-Final-Rule-Pre-publication-Version.pdf

the APA, 5 U.S.C. § 706.

9. Judicial review of Defendant's actions is also available under the doctrine of non-statutory judicial review of agency action because Defendants have acted without statutory authority and *ultra vires.*

10. The Administrative Procedure Act ("APA") also authorizes judicial review of Defendant's actions because Defendants have acted contrary to law and without lawful authority, 5 U.S.C. § 706(2)(c), arbitrarily, capriciously, and not in accordance with law. 5 U.S.C. § 706(2)(A).

11. Venue is proper under 28 U.S.C. § 1391(e)(1) because the lands that are subject to this case are located in Utah.

## PARTIES

12. Plaintiff BlueRibbon Coalition, Inc. ("BlueRibbon") is a non-profit organization with a mission to improve access to public lands by securing, protecting, and expanding shared outdoor recreation access and use. BlueRibbon is headquartered in Idaho and has members in all 50 states. Its members use and enjoy public lands in the TMA and often travel the routes now closed by the TMP. They participate in many recreational activities on our public lands – such as dirt biking, mountain biking, e-biking, backcountry aviation, base jumping, hiking, wildlife viewing, photography, scenic driving, dispersed camping, water sports, and rock climbing – but are especially involved in exploring the area with their off-highway vehicles ("OHVs"). These activities include organized rides, informal get-togethers, family vacations, and solo recreation rides. During the process of creating the TMP, BlueRibbon's members submitted "thousands . . . [of] comments in favor of protecting access to this area's high-value recreation experiences." Ex. A at A-2, ¶ 3 ("Burr Declaration"). BlueRibbon themselves regularly submitted public comments

on the plan and was an intervenor in the previous litigation that led to BLM agreeing to reconsider the previous travel plan. Ex. D ("BRC Comments); Ex. B at B-2 ("2017 Settlement Agreement").

13. Plaintiff Sage Riders Motorcycle Club ("Sage Riders") is a Utah-based group with over 200 members. They have a strong presence in the San Rafael Swell and have held local desert races for over 37 years in this area. They are also involved in promoting access to motorized trails and consistently participate in motorized recreation on public lands. They regularly visit the San Rafael Swell for the purpose of OHV recreation and have plans to return in early 2025. They had concrete plans to ride the now closed routes. Ex. A at A-1, ¶ 3 ("Anderson Declaration").

14. Plaintiff Paul Wells is a member of both BlueRibbon and Sage Riders. He is involved in organizing races and promoting access to motorized trails and frequently participates in motorized recreation on public lands. He regularly visits the San Rafael Swell for not only the purpose of OHV recreation, but to visit his historic family homestead, The Marsing Ranch, and has plans to return as soon as early spring 2025. His plans to visit his family homestead require using specific routes, but these routes are now closed under the TMP. Ex. A at A-3, ¶¶ 3, 4 ("Wells Declaration").

15. Defendant Bureau of Land Management is the agency within the United States Department of the Interior that is responsible for the management of approximately 23 million acres of federal public land in Utah, including the public lands in the TMA at issue in this litigation. BLM is directly responsible for carrying out the Department of the Interior's obligations under statutes and regulations governing land use management and for complying with NEPA, which requires the agency to carefully consider the environmental impacts of its actions.

16. Defendant United States Department of the Interior is responsible for overseeing the management of approximately five hundred million acres of federal public land across the United

States.

## STATEMENT OF FACTS

17. The TMA consists of 1,314,325 acres of land in Emery County, Utah, with 1,149,016, or 87%, of those acres being managed by BLM's Price Field Office. EA at 5. Emery County, and specifically the San Rafael Swell, have long been regarded as a popular destination for off-road recreation, with many visitors of the TMA having traveled it for decades for OHV recreation.

18. In 2008, BLM's Price Field Office released a Record of Decision and Approved Resource Management Plan that incorporated specific designations for off-road vehicle routes. Since adoption, challenges in implementations and public conformance with route designations arose due to ambiguous decisions within the route management plan ("RMP"). *Id*. In the RMP, BLM granted only 5% of the TMA as OHV-open, which permitted cross-country travel and led to the creation of visible routes throughout the open portion of the TMA. *Id*. The open areas were restricted to designated routes and BLM deferred designations in parts of these areas to future planning efforts. *Id*. This resulted in confusion and much complexity which resulted in the RMP being challenged in federal court.

19. In 2009, BLM re-published static maps for motorized use, but they only reflected a subset of the 2008 designations. So, in 2010, Emery County created its own OHV map which included routes not designated by the BLM. EA at 2.

20. In 2011, BLM began efforts to inventory routes within the TMA, per the 2008 Price RMP and collaborated with Emery County to develop new maps. *Id*.

21. In 2017, the litigation over the 2008 RMP resulted in a settlement agreement which required BLM to create all new travel management plans for Utah TMAs, including the San Rafael Swell. This decision is a result of that settlement agreement. *Id*.

22. The BLM released the preliminary alternatives, the scoping report, the baseline monitoring report, and the preliminary route reports to the public on February 22, 2024. EA at 141. BLM received over 6,000 comments, where 245 of which were considered "substantive". Of those substantive comments, only 139 led to changes in the EA or route reports. *Id*. This limited response to public input highlights that the BLM did not adequately account for the concerns and suggestions raised by the public in its decision-making process.

23. The draft EA proposed four alternative travel plans. Alternative A ("No Action Alternative") left the routes as they were. EA at 25. Alternative B ("Resource Protection Emphasis") prioritized protection of natural resources and would have closed 967 miles. *Id*. Alternative C ("Multiple Use Emphasis") was made to balance natural resource protection and motorized access and would have closed 458 miles. EA at 25-26. Alternative D ("Access Emphasis") prioritized motorized access while also accounting for natural resource protection and would have closed 53 miles. *Id*.

24. Both BlueRibbon and Sage Riders submitted comments and were identified as consulting parties for the TMP. EA at 138. Plaintiffs raised concerns regarding the impacts to dispersed camping, creation of illegal buffer zones, inconsistent reasoning for certain closures, and reliance on incomplete and inaccurate data from the 2008 Price Field Office RMP. Ex. C ("Sage Riders Comment"); Ex. D ("BRC Comments").

25. The Final Decision Record ("DR") was signed on December 31, 2024. A copy of this 2024 DR is attached hereto as Exhibit E ("Decision Record").

26. The final DR chose none of the alternatives originally presented. It combined Alternatives B, C, and D to create a hybrid alternative that "in part" responded to comments while also "prioritizing protection" of natural resources. DR at DR-5. It closed 207 more miles than the

"multiple use emphasis" alternative, Alternative C. This is despite the EA recognizing that all four alternatives are "in conformance" with BLM's management directives. EA at 5.

27. The selected alternative closes 665 miles, limits 141, and leaves only 1,355 miles open to OHVs. DR at DR-3.

28. Finally, the EA explains in detail BLM's intentions for the closed routes. In a section titled "Route Reclamation," BLM outlines how reclamation efforts will be prioritized for routes "leading into a designated wilderness area" and "routes causing resource damage, or routes with a high risk for potential impacts to resources" EA at 270-71. Reclamation efforts include "obliterate[ing] tracks" and "disguising routes with natural materials, i.e. "vertical mulching", where rocks, dead wood, and plants are added to a route to make it blend in with the surrounding areas. *Id*. BLM will also "mechanically remove routes" and "revegetate them", which is referred to as "ripping and reseeding" and will make routes "undetectable." *Id*. BLM may also install barriers, signs, and fences to foreclose travel on all closed routes. *Id*.

## <u>COUNT I</u>
*(Defendant's OHV restrictions and road closures are ultra vires and violate the Dingell Act)*

29. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

30. Defendants acted *ultra vires*, and not in accordance with law by closing routes leading into both wilderness areas and the Price River without providing justification for doing so or following the procedures mandated by law.

31. Congress has reserved for itself the sole authority to designate wilderness. 16 U.S.C. § 1131(a). Congress granted the Secretary of the Interior specific and limited authority to identify lands meeting the definition of wilderness and study those lands to make recommendations to Congress. 43 U.S.C. § 1782. The wilderness inventory and study program expired in 1993 and has

not since been expanded or reauthorized by Congress. The Department of the Interior and its agencies lack the legal authority to override the Federal Land Policy and Management Act's ("FLPMA") multiple use mandate by implementing wilderness type management.

32. Wilderness areas are some of the most protected areas of land in the entire country. The Wilderness Act of 1964 defined wilderness as areas "where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this Act an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value."

33. In 2019, the Dingell Act was passed to ensure that recreational access to public lands is not unduly restricted. A central goal of the Act is to preserve the balance between wilderness preservation and access for a wide range of recreational activities, including motorized recreation.

34. Fourteen wilderness areas designated by the Dingell Act overlap with the TMA.

35. Section 1132(e)(2) of the Dingell Act specifically prohibits the creation of "buffer zones" around wilderness areas. These "buffer zones" refer to the practice of closing or restricting access to public lands outside the boundaries of designated wilderness areas on the grounds that such access might adversely affect the wilderness characteristics of the area, including the "sight or sound" of motorized use from within the wilderness. This prohibition on "buffer zones" is

referenced 20 additional times in the Act, indicating that Congress did not intend for the designation of a wilderness area to impact adjacent lands.

36. Section 1211 of the Dingell Act also established specific guidelines for managing public lands in Emery County, designating the San Rafael Swell as a "recreation area." In Section 1221(b), the purpose of this recreation area is outlined as "...to provide for the protection, conservation, and enhancement of *recreational*, cultural, natural, scenic, wildlife, ecological, historical, and educational resources." (emphasis added).

37. Nevertheless, the TMP creates buffer zones around several wilderness areas within the TMA, with the highest infractions being around Sid's Mountains, Mexican Mountain Wilderness, and Devil's Canyon Wilderness. The maps below show how the closed routes expand wilderness boundaries for (1) Sid's Mountains, (2) Mexican Mountain Wilderness, and (3) Devil's Canyon Wilderness:

Sids Mountains before:



Sids Mountains After:



Mexican Mountain Wilderness before:



Mexican Mountain Wilderness after:



Devil's Canyon Wilderness before:



Devil's Canyon Wilderness after:



38. Further, Congress created the National Wild and Scenic River System P.L. 90-542; U.S.C. 1271 *et seq,* which created a classification system deeming a river either "wild" or "scenic" based largely on its accessibility via roads. 16 U.S.C. 1273(b).

39. "Scenic River Areas" are "[t]hose rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but *accessible in places by roads*." *Id* (emphasis added). In contrast, Congress defined "Wild River Areas" as "[t]hose rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted." *Id.*

40. In 2019, in conjunction with the Dingell Act, Congress added segments of Utah's Green River to the Wild and Scenic River system. 43 C.F.R. §1241. Most of the Green River was designated "scenic", with a small northerly portion being designated "wild".

41. The Dingell Act did not include any language regarding Utah's Price River. Despite this, BLM has closed many routes "to encourage only non-motorized access along the Price River to help protect sensitive resources." DR at DR-8. This management approach has created a designated wild river in contradiction to what Congress intended. If it was Congress' intent to prioritize non-motorized recreation along the Price River, it would have done so explicitly.

42. Plaintiffs request that this Court find that Defendants acted unlawfully and *ultra vires* by prohibiting the use of OHVs along certain routes and creating both *de facto* wilderness and a *de facto* wild river. A favorable decision from this Court will redress Plaintiffs' legal injuries and will allow Plaintiffs' plans to travel the TMA to remain intact. This decision would also allow for the subject of wilderness to remain where it belongs, with Congress.

## COUNT II
*(Defendant's actions are arbitrary and capricious)*

43. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

44. Defendant's actions were arbitrary and capricious in many ways.

45. First, the agency "fail[ed] to consider an important aspect of a problem or offer[ed] an explanation for the decision that is contrary to the evidence . . ." *Or. Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (cleaned up). And "the agency fail[ed] to 'articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made.'" *Friends of Wild Swan, Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)). BLM

46. Second, the agency failed to respond to relevant' and significant public comments. *See N.M. Health Connections v. United States HHS*, 340 F. Supp. 1112, 1167 (D. N.M. Oct. 19, 2018)

(quoting *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014)). This demonstrates that the TMP was not based on consideration of the relevant factors.

47. BLM never addressed commenters' (including Plaintiffs) concerns regarding the Dingell Act.

48. For example, Plaintiff Sage Riders' comment cited routes SS3314, SS3269, SS3268, SS3329, SS3271, and SS3270 within the wilderness area known as "Sid's Mountains" and point out these are "[cherry stimmed] routes into the wilderness area supported by the Dingell Act" and explain that *all* access roads and trails that support these routes must be left open, or else BLM will inevitably create "buffer zones" in violation of the Dingell Act. Ex. C at 10 ("Sage Riders Comment"). BLM not only failed to respond to their comment but closed access roads and trails to these routes.

49. BLM justified closures based on "user conflict" without explaining how it came to that conclusion. BLM closed routes SS1404 and SS1404A because "motorized use conflicts with non-motorized users." DR at A2-81, 82. This is arbitrary and capricious because, despite never being closed to motorized use, horseback riders use these routes often and BLM cited zero conflicts between them and motorized users. Ex. A at A-3, ¶¶ 12, 13 ("Wells Declaration"). Also, in their own route reports, BLM refers to these routes as "primitive roads" that only receive "low" use with the only mode of transportation being "motorcycle". Basically, BLM claimed that these low-use single-track routes are resulting in user conflicts large enough to support closure. This cannot be the case.

50. BLM did not provide a satisfactory explanation as to why it had the Principal Deputy Assistant Secretary of Lands and Minerals Management, Steven Feldgus, approve the TMP.

Historically, BLM has utilized the signature of the associated BLM District Manager to approve travel management plans. This provides aggrieved parties a 30-day period to appeal to the Interior Board of Land Appeals ("IBLA"), where the decision cannot take effect until this window expires. *See* 43 C.F.R. Part 4; § 4.21. Parties may also submit a petition to stay with the notice of appeal, delaying the implementation of the decision even further. *Id.* This is a well-known safeguard, and an IBLA decision is a final agency action for the purposes of judicial review. *See* 43 C.F.R. §§ 4.21(d), 4.403.

51. BLM instead relied on an exception that forfeits a party's ability to appeal to the IBLA. It explains if the Secretary signs a Decision, a party may not appeal to the IBLA and instead must bring an action in federal court. *See* § 4.410 (a)(3); DR at DR-11.  Upon the Secretary's approval, the Decision is effective immediately.

52. This is not typical practice for BLM. For example, Plaintiffs are currently, and have previously been, parties in lawsuits concerning the BLM's decisions on the Labyrinth Rims/Gemini Bridges TMP and San Rafael Desert TMP, both of which provided Plaintiffs the opportunity to appeal to the IBLA. Ex. F ("IBLA Appeal Opportunities"). For an unknown reason, plaintiffs are no longer extended this courtesy. The inability to rely on the 30-day window as a temporary safeguard in plan implementation results in immediate harm and BLM provides no explanation for its decision, making it arbitrary and capricious.

53. Specifically, Plaintiff Paul Wells faces immediate harm because of this decision. The routes necessary to access his family homestead, the Marsing Ranch, are now closed. These are routes SS1404, SS1404A, and SS1235. Ex. A at A-3 at ¶ 4 ("Wells Declaration"). BLM tries to rectify these three closures by citing SS1234A, SS1403, SS1001, and SS1547B as alternative access points, but a simple viewing of the map makes clear this is arbitrary and capricious. Each

route is at least a mile from the Marsing Ranch, with one situated on a cliff 1,000 feet above the ranch requiring a sharp descent, and another requiring passage across private property.

54. The decision to have Steven Feldgus approve of the TMP is not explained anywhere within the entire planning process, runs completely counter to BLM's *status quo* of allowing appeals to the IBLA, and results in immediate harm to Plaintiffs.

55. BLM also failed to follow their own scientific data when closing routes. They relied on the presence of bighorn sheep for a multitude of route closures yet acknowledge that their habitat makes up 36% of the TMA, with 70% of that being within designated wilderness areas. EA at 179. Motorized use is already forbidden within wilderness areas, so to justify route closures based on bighorn sheep presence is arbitrary and capricious.

56. As stated in preceding paragraphs, *Marin Audubon Society v. FAA*, No. 23-1067 (D.C. Cir. 2024) ruled that federal agencies may not rely on regulations unless those regulations have a clear, statutory basis.

57. BLM relied on their "minimization criteria" found in 43 C.F.R. §8342.1 for the basis of route closures throughout the TMP. They cite their criteria's justification in The Federal Land Policy and Management Act ("FLPMA"), and Executive Orders 11644 and 11989, with the minimization criteria being pulled verbatim from the executive orders. EA at EA-3. But the Court in *Marin* made clear: "An executive order is not law within the meaning of the Constitution", and as such, ". . . regulations cannot be justified solely as an exercise in a President's oversight of his administration." *Id*. Further, FLPMA only provides a broad mandate for multiple use and sustained yield, it does not provide a "clear, statutory basis" for these minimization standards.

58. Accordingly, the use of these minimization criteria lacks the requisite statutory basis under *Marin*, resulting in arbitrary decision making.

59. Both Defendant's route closures and decision to have the Principal Deputy Assistant Secretary of Lands and Minerals Management approve the TMP were adopted without any sense of uniformity of reasoning or observance of lawful procedures and are therefore arbitrary, capricious, and not in accordance with the law.  Accordingly, the Court should declare the TMP arbitrary and capricious and set it aside.

### COUNT III
*(Defendant's actions violate NEPA)*

60. Plaintiffs reallege and incorporate by reference the preceding paragraphs.

61. NEPA was enacted in 1970 and requires federal agencies to consider the environmental impact of projects before approving or rejecting them. *See* 42 U.S.C. § 4321 et seq. Its "purpose and function" is to show that "Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process." 40 C.F.R. § 1500.1.

62. NEPA requires agencies to take a "hard look" at how choices before them affect the environment. *Ctr for Biological Diversity v. United States*, 72 F.4th at 1178. This requires utilizing "public comment and the best available scientific information." *Id*. (quoting *Colo. Envtl. Coal v. Dombeck*, 185 F.3d 1162, 1171 (10 Cir. 1999)). And agencies must consider direct, indirect, and cumulative effects of the action. *Id*.

63. NEPA also requires agencies to conduct an Environmental Impact Statement ("EIS") for federal actions that significantly affect the quality of the human environment. See 42 U.S.C. § 4332(C). The "human environment means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m). In contemplating the human environment, agencies must consider the effects

of their policies, whether beneficial or detrimental. *Id*. § 1508.1(g)(4).

64. If an agency does not prepare an EIS, it must prepare an environmental assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. §§ 1502.14, 1502.16.

65. In the absence of an EIS, the EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). *Id*. § 1508.9(a)(1). The evidence must demonstrate that the action "will not have a significant effect on the human environment." *Id*. § 1508.13.

66. Here, BLM failed to conduct an Environmental Impact Statement ("EIS") as required by NEPA because of the significant effect on the human environment. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.14.

67. BLM should not have issued a FONSI, finding that their closure of 665 miles that had been lawfully utilized for decades had no significant impact on the human environment. It is hard to believe that a travel plan such as this has no bearing on ". . . the relationship of present and future generations of Americans with that environment" due to the vast closures of once popular routes. 40 C.F.R. § 1508.1(m).

68. A major federal action, such as an EIS, is one that "requires substantial planning, time, resources, or expenditure." *Nat'l Resources Defense Council, Inc. v. Grant*, 341 F. Supp. 356, 366 (March 15, 1972). "Typically, a project is considered a major federal action when it is funded with federal money." *Southwest Williamson County Comty. Ass'n v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001).

69. The amount of planning and coordination that went into the TMP is considerable. Hundreds of miles were inventoried. The DR shows every route with their associated explanations for either opening or closing them. Further, there were thousands of "route reports" issued where upwards of twelve experts considered the natural, recreational, cultural, commercial, and historical

values of each route. It is clear that substantial planning, time, and resources took place. Despite this, Defendants cherry-picked evidence that fit their narrative that no such harm to the human environment took place. The TMP should be set aside.

70. As discussed previously, the CEQ Director signed a notice of an interim rule removing CEQ's regulations from the Code of Federal Regulations. This notice explains how agencies may rely on the version of CEQ's regulations in effect when the challenged agency action was completed.[7]

71. BLM relied on the version of CEQ's regulations that called for implementing an EA and FONSI in lieu of an EIS.

72. Under *Marin*, this reliance is still questionable. The Court made clear that no statute ever granted CEQ the authority to issue binding regulations. If this is the case, the notice does not justify BLM's baseless reliance on CEQ regulations for creating an EA and FONSI. In fact, it calls the entire TMP into question.

73. Whether the Court relies on prior CEQ regulations, requiring BLM to implement an EIS instead of an EA, or follows the new CEQ precedent, Plaintiff's request is the same. The Court should set aside the TMP.

## PRAYER FOR RELIEF

Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, it is appropriate and proper that a declaratory judgment be issued by this Court, declaring that the DR is unlawful.

Furthermore, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 65, it is appropriate and hereby requested that the Court issue a permanent injunction prohibiting Defendants from

---

[7] *Id* at 13-14.

enforcing the new policy.

WHEREFORE, Plaintiffs respectfully request that this Court grant relief against Defendants as follows:

(1) Declare that Defendant's San Rafael Swell Travel Management Plan violates the Dingell Act, Administrative Procedures Act, and National Environmental Policy Act;

(2) Hold unlawful and set aside the San Rafael Swell Travel Management Plan;

(3) Issue a permanent injunction against Defendants, as well as all agents, administrators, employees, or other persons acting on behalf of the Defendants from enforcing the San Rafael Swell Travel Management Plan;

(4) Award Plaintiffs their costs and expenses incurred in bringing this action, including, but not limited to, reasonable attorney fees pursuant to 28 U.S.C. § 2412; and

(5) Grant such other and further relief as the Court deems equitable, just, and proper.


Respectfully submitted on this 5th day of March, 2025.

BLUERIBBON COALITION, INC.

*/s/ Isabella Eldridge*
Isabella Eldridge
*Attorney for Plaintiffs*