Isabella Eldridge (Utah Bar No. 19517)
BLUERIBBON COALITION, INC
PO Box 76
New Plymouth, ID 83655
Telephone: (405) 464-9060
Email: bella.eldridge@blueribboncoalition.org

*Attorney for BlueRibbon Coalition, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, SOUTHERN DIVISION

| | |
|---|---|
| BLUERIBBON COALITION, INC.; SAGE RIDERS MOTORCYCLE CLUB; and PAUL WELLS<br><br>       Plaintiffs,<br><br>vs.<br><br>BUREAU OF LAND MANAGEMENT, U.S. DEPARTMENT OF THE INTERIOR<br><br>       Defendants. | Case No. 4:25-cv-00022-DN<br><br>**PLAINTIFFS' MOTION FOR RELIEF UNDER 5 U.S.C. § 705, OR, ALTERNATIVELY, FOR A PRELIMINARY INJUNCTION** |

Pursuant to 5 U.S.C. § 705, Plaintiffs BlueRibbon Coalition, Inc. ("BlueRibbon"), Sage Riders Motorcycle Club ("Sage Riders"), and Paul Wells seek relief from this Court against Defendants Bureau of Land Management ("BLM") and United States Department of Interior ("DOI") to enjoin them from implementing the San Rafael Swell Travel Management Plan Decision Record (the "TMP" or "DR"). Plaintiffs challenge the constitutional and statutory authority of Defendant's agency order implementing a travel plan for an estimated 1,149,016 acres managed by BLM.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... 3

INTRODUCTION ..................................................................................................................... 4

SUMMARY OF REQUESTED RELIEF .................................................................................. 5

STATEMENT OF FACTS ........................................................................................................ 5

STANDARD FOR GRANTING THE MOTION .................................................................... 7

ARGUMENT ............................................................................................................................. 7

    I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ................................... 7

        *A.   Defendant's OHV restrictions and road closures are ultra vires and violate the Dingell Act.* .... 8

        *B.   Defendant's actions were arbitrary and capricious.* ............................................................... 11

        *C.   Defendants violated NEPA.* ................................................................................................. 15

    II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT RELIEF. ...................... 17

    III.   RELIEF IS NOT ADVERSE TO THE PUBLIC INTEREST AND PLAINTIFFS' INJURIES OUTWEIGH ANY ALLEGED DAMAGE TO DEFENDANTS. ................................. 19

    IV.   ALTERNATIVELY, THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION BUT NO BOND SHOULD BE REQUESTED IF THE COURT ISSUES THE INJUNCTION... 20

    V.    ALTERNATIVELY, PLAINTIFFS REQUEST THE COURT ORDER DEFENDANTS TO NOT OBLITERATE ROUTES UNTIL THE END OF THIS CASE. ................................................ 21

CONCLUSION ........................................................................................................................ 21

CERTIFICATE OF SERVICE ................................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)..............................................16

*Colorado v. United States EPA*, 989 F.3d 874 (10th Cir. 2021)...........................................................7

*Ctr. for Biological Diversity v. U.S. Forest Serv*., 349 F.3d 1157, 1167 (9th Cir. 2003) ..........................16

*Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) ............................................................12

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) ...............................................................................................................................12

*Marin Audubon Society v. FAA*, 23-1067 ..................................................................................7

*Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371 (1990) .............................................................16

*Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1974 U.S. App ...............................16

*N.M. Health Connections v. United States HHS*, 340 F. Supp. 1112, 1167 (D. N.M. Oct. 19, 2018)........12

*Nken v. Holder*, 556 U.S. 418, 434 (2009)..................................................................................7

*Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1099 (9th Cir. 2010).................................................15

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) ...........................................16

**Statutes**

16 U.S.C.§ 1132 et seq.......................................................................................................5

42 U.S.C. § 4321 *et seq* ......................................................................................................5

42 U.S.C. § 4332(2)(C).....................................................................................................16

42 U.S.C.§ 4332(C) ........................................................................................................16

**Regulations**

40 C.F.R. § 1502.14 .........................................................................................................16

40 C.F.R. § 1508.1(m) ......................................................................................................16

43 C.F.R. § 8340.0-7.........................................................................................................14

43 C.F.R. §1241 .............................................................................................................10

43 C.F.R. §8342.1 ...........................................................................................................15

43 C.F.R. Part 4; § 4.21 ....................................................................................................14

## INTRODUCTION

Plaintiffs are seeking relief to prevent Defendant's ongoing violation of multiple federal statutes. Plaintiffs are BlueRibbon, Sage Riders, and Paul Wells and are seeking to improve access to motorized routes on Public Lands. On December 31, 2024, BLM issued a Decision Record ("DR"), Finding of No Significant Impact ("FONSI"), and Environmental Assessment ("EA")[1] that adopted a new travel plan in the San Rafael Swell Travel Management Area ("TMA"). The new travel management plan ("TMP" or "DR") closed 665 miles of previously available routes to motorized recreation in the TMA.

The TMA is located northwest of Moab, Utah, in Emery County and is home to some of the most pristine landscapes in the world which include canyons, rivers, arches, and mesas. Because of these spectacular landscapes, it has long been a premier destination for off-highway vehicles ("OHVs") and motorized recreation.

Despite this rich history of offroad recreation, OHV users have experienced unceasing attempts from BLM and other anti-access groups to restrict access. Motorized users were already dealt a blow in the 2008 TMP/RMP which closed hundreds of miles to motorized recreation. However, several anti-access groups desired more closures which resulted in extensive litigation to which the BLM agreed to redo the travel plan at issue while leaving the 2008 plan in place. Ex. B at B-2 ("2017 Settlement Agreement"). This latest DR eliminates motorized access even more, closing an additional 665 miles.

---

[1] *See* Bureau of Land Management, *San Rafael Swell Travel Management Plan Environmental Assessment,* DOI-BLM-UT-G020-2019-0019-EA (Dec. 2024); Bureau of Land Management, *Finding of No Significant Impact*, DOI-BLM-UT-G020-2019-0019-EA (Dec. 2024); Bureau of Land Management, *San Rafael Swell Travel Management Plan Decision Record*, DOI-BLM-UT-G020-2019-0019-EA (Dec. 2024). These documents are available on BLM's website: https://eplanning.blm.gov/eplanning-ui/project/1500146/570

These closures violate multiple federal statutes. First, the closures violate the John D. Dingell, Jr. Conservation, Management, and Recreation Act (the "Dingell Act"), 16 U.S.C.§ 1132 et seq., by using the TMP to create *de facto* wilderness and wild river designation. Second, the closures were arbitrary and capricious or otherwise not in accordance with the law because BLM ignored important aspects of the decision, offered explanations that ran counter to the evidence, and failed to respond to relevant and significant public comments. Third, BLM failed to take a "hard look" at how the choices before them affect the environment in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq*.

## SUMMARY OF REQUESTED RELIEF

Pursuant to Fed. R. Civ. P. 65 and district of Utah Local Rule 7-1, Plaintiffs respectfully request that this Court:

1) Postpone the effective date of the *San Rafael Swell Travel Management Plan Decision Record*, DOI-BLM-UT-G020-2019-0019-EA (Dec. 2024), until 60 days after this case is resolved on the merits.

2) Alternatively, issue a preliminary injunction enjoining Defendants from enforcing the new TMP and waive the requirement in Fed. R. Civ. P. 65(c) for Plaintiffs to Post a bond.

## STATEMENT OF FACTS

On December 31, 2024, BLM released the Final EA, FONSI, and DR adopting the San Rafael Swell Travel Management Plan.  The EA analyzed four alternative travel plans, from which the final TMP was meant to choose from. However, BLM chose a plan that fit none of the four alternatives and was designed as a response to overwhelming public commentary and the desire to "protect resources" and "minimize user conflicts". DR at DR-5 (*i.e.,* Exhibit E ("Decision Record")).

Plaintiffs BlueRibbon and Sage Riders are organizations adversely affected by the DR because their members use the closed routes and extensively participated in the process leading up to BLM's decision.  Ex. C ("Sage Riders Comment"); Ex. D ("BRC Comment"). Plaintiff Wells is a member of both the Sage Riders and BlueRibbon and regularly visits the San Rafael Swell for not only OHV recreation, but to visit his historic family homestead, the Marsing Ranch, and has plans to return as soon as early spring of this year. His plans to visit his family homestead require using specific routes, but these routes are now closed under the TMP.  Ex. A at A-3, ¶¶ 3, 4 ("Wells Declarations"). BlueRibbon was previously an intervenor in the litigation that resulted in BLM agreeing to redraw the previous travel plan. *See* 2017 Settlement Agreement.

The TMA consists of a little over 1,300,000 acres of land located in Emery County in Eastern Utah. EA at 3, 4. It is "one of the region's most well-known and popular scenic attractions." *Id.* Features such as San Rafael Reef, Wedge Overlook, Mexican Mountain, Buckhorn Draw, and Temple Mountain draw in "high levels of recreation visitation." *Id.*

OHV access within the TMA has experienced shrinkage for decades. The 2008 RMP closed 557,000 acres to trails and restricted OHV access on an additional 1,922,000 acres. However, anti-access groups continued to advocate for the closure of additional trails and subsequently filed a lawsuit. The case concluded with a settlement agreement, wherein BLM committed to developing new TMPs for 13 distinct TMAs, including the San Rafael Swell TMA. *See* 2017 Settlement Agreement.

On December 4, 2024, BlueRibbon Coalition sent the BLM Price Field Office Manager and the Utah State Director a certified letter explaining they should stay this TMP until agencies get more guidance on how to proceed under the new precedent set forth under *Marin Audubon*

*Society v. FAA*, 23-1067, which held that the Council on Environmental Quality ("CEQ") has no authority to issue regulations implementing NEPA, thus rendering CEQ's NEPA guidelines invalid and ineffective. Ex. B at B-1 ("BRC Letter"). BlueRibbon received no response, and this DR was released 27 days later. A District Court in North Dakota then affirmed the Decision in *Marin*,[2] and on February 19, 2025, a notice of an interim rule removing CEQ's regulations from the Code of Federal Regulations was released.[3]

**STANDARD FOR GRANTING THE MOTION**

When deciding whether to grant a motion under 5 U.S.C. § 705 or grant a preliminary injunction, courts apply an almost identical four-factor test. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (noting the "substantial overlap" between factors for a stay pending appeal and a preliminary injunction); *Colorado v. United States EPA*, 989 F.3d 874 (10th Cir. 2021) (The four preliminary injunction factors "also determine when a court should grant a stay of agency action under section 705 of the APA.") Courts consider: (1) whether the movant has made a "strong showing" of likely success on the merits; (2) whether [they] will be irreparably injured absent preliminary relief; (3) whether preliminary relief "will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken, 556 U.S. at 434 (quotation omitted). The final factors "merge" and are considered in tandem if "the Government is the opposing party." *Id*. at 435.

**ARGUMENT**

## I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

The Complaint raises three counts. Plaintiffs are likely to prevail on each of them.

---

[2] Order, *State of Iowa v. Council on Env't Quality*, No 1:24cv00089 (D.N.D. Feb. 3, 2025), ECF No. 145.
[3] *See* https://ceq.doe.gov/docs/laws-regulations/CEQ-Interim-Final-Rule-Pre-publication-Version.pdf

A.  *Defendant's OHV restrictions and road closures are ultra vires and violate the Dingell Act.*

The Dingell Act created 14 distinct wilderness areas that overlap the TMA. They comprise 427,054 acres, or 32%, of the entire TMA. Section 1232(e)(1) of the Dingell Act specifically forbids the creation of "protective perimeters or buffer zones" around any wilderness areas. Further, the Dingell Act explicitly provides "[t]he fact that nonwilderness activities or uses can be seen or heard from areas within a wilderness area *shall not preclude* the conduct of those activities or uses outside the boundary of the wilderness area." Section 1232(e)(2) (emphasis added). Despite this, the DR closes a plethora of routes near multiple different wilderness areas. This is *ultra vires* and a plain violation of the Dingell Act, as it expands wilderness areas beyond what Congress intended. These infractions can be plainly seen by examining the maps BLM provides. *See* BlueRibbon Coalition Complaint ¶ 37. (Six maps are provided to illustrate the expansion of wilderness boundaries due to closed routes).

For example, in Sid's Mountains, Plaintiff Sage Riders cite routes SS3314, SS3269, SS3268, SS3329, SS3271, and SS3270 within this wilderness area and point out these are "[cherry stimmed] routes into the wilderness area supported by the Dingell Act" and explain that *all* access roads and trails that support these routes must be left open, or else BLM will inevitably create illegal "buffer zones". *See* Sage Riders Comment at 10. Unfortunately, BLM closed SS3331, SS3332, SS3333, SS3334, SS3335, and SS3345 which provide access to these routes, and an additional route, SS3327, which borders Sids Mountains. These closures result in an impermissible expansion of the wilderness boundary.

In explaining the closure of another route, SS3115 near Sid's Mountains, BLM justified it based on motorized recreation having the "potential to affect resources", and then explained how it "may be more suitable for hiking and horseback riding." DR at A2-256. Hiking and horseback

8

riding are the main two recreational activities allowed within a designated wilderness area. To put it plainly, this rationale is just a roundabout way of expanding wilderness beyond Congress' intent.

Further, in the management of routes SS5021, SS5022, and SS55023, BLM has completely strayed from the Dingell Act's orders. These routes lead directly into Devil's Canyon wilderness. For route SS5021, BLM's own decision rationale states closure of this route "supports the protection of Congressionally Designated Wilderness . . ." DR at A2-437. And for routes SS5022 and SS5023, they similarly "lead into wilderness", and are "in Devil's Canyon". *Id*. This alone shows BLM's intent to expand the wilderness boundary. By closing routes SS5021, SS5022, and SS5023, BLM is forcing the public to hike many extra miles to access an already secluded trailhead in Devil's Canyon, with wilderness areas already being remote and requiring significant preparation and physical capability for access. Ex. A at A-2, ¶ 7 ("Burr Declaration"). Given this, it is reasonable to conclude that the recent closures will result in a marked decrease in visitation to Devil's Canyon Wilderness.

BLM also closed routes SS2174B, SS2176B, SS2182, and SS2186 which are direct access points to the Mexican Mountain Wilderness. BLM acknowledges this when giving their decision rationale for SS2174B: "This route leads into the Mexican Mountain Wilderness", and the same for SS2176B: "This route is used for dispersed camping and access to wilderness areas." DR at A2139-40. In their route reports, BLM states the basis for closing all four of these routes is to "prevent impairment of wilderness suitability", and more specifically for route SS2174B, "[to] reduce visual contrast created by the route."[4] By closing these routes in areas

---

[4] *See* https://eplanning.blm.gov/public_projects/1500146/200323703/20125797/251025777/Combined%20Route%20Reports%20SS1401%20to%20SS2199.pdf

directly adjacent to designated wilderness, BLM has created de facto wilderness, extended boundaries beyond the boundaries designated by Congress, and created what can only be described as a buffer zone. This is in direct opposition to the Dingell Act.

In addition to violating the express language of the Dingell Act, certain closures conflict with Congress's intent that routes be kept open to access rivers. In the Wild and Scenic River Act of 1968, Congress created the National Wild and Scenic Rivers System. P. L. 90-542; U.S.C. 1271 *et seq.* Within this, Congress created a classification system deeming a river either "wild" or "scenic" based on its accessibility via roads. 16 U.S.C. 1273(b). "Scenic River Areas" are "[t]hose rivers or sections of rivers that are free of impoundments, with shorelines or watersheds still largely primitive and shorelines largely undeveloped, but *accessible in places by roads*." *Id* (emphasis added). In contrast, Congress defined "Wild River Areas" as "[t]hose rivers or sections of rivers that are free of impoundments and generally inaccessible except by trail, with watersheds or shorelines essentially primitive and waters unpolluted." *Id*.

In 2019, via the Dingell Act, Congress added segments of Utah's Green River to the Wild and Scenic Rivers system. 43 C.F.R. §1241. Most of the Green River was designated as "scenic," while a northerly portion was granted the more restrictive "wild" classification. Congress was clear that road access to the Green River was a priority given its mostly *scenic* designation. What Congress did not include anywhere within the Dingell Act is Utah's Price River. Despite this, BLM has closed certain routes "to encourage only non-motorized access along the Price River to help protect sensitive resources." DR at DR-8.

In fact, routes SS1235, SS1404, and SS1404A are closed to "encourage only non-motorized access along the Price River . . ." DR at A2-56, A2-81-82. Yet, SS1404A and SS1404 neither cross, nor touch, the Price River. *See* Wells Declaration at ¶ 14. Similarly, route SS1235

only crosses the river once, and due to winter conditions leading to heavy spring runoff, its use is sparse. *Id*. Routes SS1160 and SS1161 are also closed to "reduce route proliferation near the Price River". DR at A2-46. And BLM describes route SS1234A to be "the only route that provides motorized access down to the Price River in this area." DR at A2-56. This implies many other motorized routes accessing the river are closed.

It makes sense that if Congress's intent was to prioritize non-motorized recreation along the Price River, it would have done so explicitly by granting it as a Wild or Scenic River like it did the Green River. Because of this restrictive management approach, BLM violated both the Dingell Act and Wild and Scenic Rivers Act by adopting a plan that creates a *de facto* Wild River.

B. *Defendant's actions were arbitrary and capricious.*

An agency decision is arbitrary and capricious under the APA where the agency "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (quotations omitted). Additionally, "failure to respond to relevant and significant public comments generally 'demonstrates that the agency's decision was not based on a consideration of the relevant factors.'" *N.M. Health Connections v. United States HHS*, 340 F. Supp. 1112, 1167 (D. N.M. Oct. 19, 2018) (quoting *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014). Both errors are committed here.

The TMP contains many arbitrary closures, such as those for routes SS1404, SS1404A, and SS1235, which have never been closed to motorized access and provide direct access to the

historic Marsing Ranch and the state school trust land ("SITLA") that it sits upon. *See* Wells Declaration at ¶ 3. In their decision rationale, BLM acknowledges that SS1404 and SS1404A are the *only* main access routes to the Marsing Ranch and the SITLA parcel. DR at A2-81, 82. BLM also justifies closure of SS1404 and SS1404A due to "motorized use conflict[ing] with non-motorized users". *Id*. This directly contradicts their own route reports which acknowledge there were "no known conflicts among users."[5] Moreover, these routes have always been open for single-track use under the thumb of BLM monitoring for over 20 years without any documentation to substantiate any infractions. *See* Anderson Declaration at ¶ 7. This is the definition of arbitrary and capricious.

BLM cites routes SS1001, SS1234A, SS1403, and SS1547B as alternatives to access the Marsing Ranch, but a simple review of the map reveals this is arbitrary and capricious. Each route is at least a mile from the ranch, with one located on a cliff 1,000 feet above, requiring a treacherous descent, and another passing through gated, private property.

Furthermore, BLM describes these three routes as "primitive roads" with "low" usage with the only mode of transportation being "motorcycle," yet claim they cause significant damage to sensitive resources. This contradicts both the reality of the routes' use and BLM's own reports, which acknowledge that the "potential impacts" could be mitigated without closure.[6] BLM's description of them being "narrow trails" in their route reports is also misleading, as these are single-track routes, which, according to BLM's own policies, *minimize* damage to resources. DR at A2-93-96; A2-98-99 (decision rationales discussing the single-track system in the Chimney Rock Humbug area being kept open because single-track "keeps it narrow and minimize[s] damage"). BLM uses this specific language so many times in reference to single-

---

[5] *Id* at 14-27.
[6] *Id.*

track that it would take too long to cite every instance. Thus, BLM's rationale for closing routes SS1235, SS1404A, and SS1404 based on resource protection is inconsistent and arbitrary.

The TMP's decision to close route SS2070 is also arbitrary and capricious. For both routes SS2070 and SS2072, BLM cites them as providing network connectivity for recreational opportunities where the potential impacts can be mitigated without closure.[7] Despite this, in the decision rationale for SS2070, BLM threw in everything from Areas of Critical Environmental Concern ("ACECs") to pronghorn habitat to riparian areas as justification for closure. They also state that it is a "dead end that leads to a dispersed campsite near the river." DR at A2-126. In contrast, BLM left SS2072 open and acknowledged it as providing access to "an undeveloped campsite" and "important for network connectivity." *Id*. These two routes exist within a homogeneous network for dispersed camping along the Mexican Mountain wilderness, so to recognize the importance of one and not the other is arbitrary and capricious.

BLM also acted arbitrarily and capriciously when it had the Principal Deputy Assistant Secretary of Lands and Minerals Management ("Secretary"), Steven Feldgus, approve the TMP. Historically, BLM has utilized the signature of the associated BLM District Manager to approve each travel management plan. This process allows aggrieved parties a 30-day period in which they can appeal to the Interior Board of Land Appeals ("IBLA"), where the decision cannot take effect until this window expires. 43 C.F.R. Part 4; § 4.21. Parties may also submit a petition to stay with the notice of appeal, delaying implementation of the decision even further. *Id*. This is a well-known safeguard that has been utilized repeatedly in BLM travel plans. Despite this, BLM relied on an exception that forfeits a party's ability to appeal to the IBLA when the

---

[7] *Id* at 1049, 1063.

Secretary signs the Decision. Once the Secretary approves, the Decision is effective immediately with the only redress being an action in federal court. *See* § 4.410 (a)(3); DR at DR-11.

The decision for the Secretary to sign this ruling is unconventional and contradicts both ongoing and past lawsuits in which Plaintiffs have been, and continue to be, parties. Two examples include the current case involving the TMP for Labyrinth Rims/Gemini Bridges and a past case regarding the TMP for the San Rafael Desert. Ex. F ("IBLA Appeal Opportunities"). For each of those cases, BLM gave parties, including Plaintiffs, the opportunity to appeal the decision(s) to the IBLA. For an unknown reason, Plaintiffs are no longer extended this courtesy. The inability to rely on that 30-day window as a temporary safeguard results in immediate harm and BLM provides no explanation for its decision, making it arbitrary and capricious.

More pointedly, Plaintiff Paul Wells faces immediate harm because of this decision. BLM closed the routes necessary to access his family homestead, the Marsing Ranch. These routes were addressed in previous paragraphs and are SS1404, SS1404A, and SS1235. Without access to the IBLA, plaintiffs like Paul Wells that are affected by these decisions are deprived of an essential forum to challenge actions that violate the protections set forth in statutes like the Dingell Act. The decision to have the Secretary approve the TMP is not explained anywhere within the entire planning process, runs completely counter to BLM's *status quo* of allowing appeals to the IBLA, and results in immediate harm to plaintiffs.

Finally, BLM relied on their "minimization criteria" found in 43 C.F.R. §8342.1 as the basis for route closures. They cite the criteria's justification in the The Federal Land Policy and Management Act ("FLPMA"), and Executive Orders ("EO") 11644 and 11989, with the BLM pulling them verbatim from the EOs. EA at EA-3. However, *Marin Audubon Society v. FAA*, No. 23-1067 (D.C. Cir. 2024) made clear that agencies may not rely on regulations absent

14

a "clear, statutory basis", and that "an executive order is not law within the meaning of the

Constitution." *Id.* FLPMA only provides a broad mandate for multiple use and sustained yield, it

does not provide a "clear, statutory basis" for these minimization criteria. As such, the use of

these minimization criteria lacks the requisite statutory basis, resulting in arbitrary decision

making. The Court should set aside the Decision.

### C. Defendants violated NEPA.

BLM failed to take a "hard look" as required by NEPA. "[B]y requiring agencies to take

a 'hard look' at how the choices before them affect the environment, and then to place their data

and conclusions before the public, NEPA relies upon the democratic processes to ensure . . . that

the most intelligent, optimally beneficial decision will ultimately be made." *Or. Natural Desert*

*Ass'n v. BLM*, 625 F.3d 1092, 1099 (9th Cir. 2010). Further, "general statements" are not enough

to satisfy the hard look requirement. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491

(9th Cir. 2011). As such, courts reviewing "hard look" cases must make sure the agency's

decision "was based on a consideration of the relevant factors," and make a "searching and

careful" inquiry into the factual basis for the decision. *Citizens to Preserve Overton Park, Inc. v.*

*Volpe*, 401 U.S. 402, 416 (1971). Thus, agencies must provide "accurate scientific analysis …

[for] public scrutiny before decisions are made and actions taken." *Ctr. for Biological Diversity*

*v. U.S. Forest Serv.*, 349 F.3d 1157, 1167 (9th Cir. 2003). BLM failed on all accounts with

respect to this plan.

BLM also abandoned its duty to take a "hard look" by failing to create an environmental

impact statement ("EIS"), in violation of 42 U.S.C. § 4332(2)(C) and 40 C.F.R. § 1502.14. An

EIS is required when a "major Federal action[] significantly affect[s] the quality of the human

environment." 42 U.S.C.§ 4332(C). The cornerstone of NEPA's "hard look" requirement is so an

"agency will not act on incomplete information only to regret its decision after it is too late." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 371 (1990). Despite this, BLM decided to forgo an EIS and release a FONSI which concluded that the plan has no significant impact on the human environment.

The human environment is defined as ". . . comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment." 40 C.F.R. § 1508.1(m). As such, "There has been increasing recognition that man and all other life on this earth may be significantly affected by actions which on the surface appear insignificant." *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1974 U.S. App. Despite the continual poor treatment towards OHV-based recreation, it is without question that it is still an important part of the human environment. This is made clear by the sheer amount of public input BLM received from various motorized recreational groups.

Also, the amount of planning and coordination that went into the TMP is considerable. BLM inventoried hundreds of miles of routes. The DR shows every route with their associated explanations for either opening or closing them. Also, there were thousands of route reports issued where upwards of twelve experts considered the natural, recreational, cultural, commercial, and historical values of each route. Substantial planning, time, and resources took place. Despite this, Defendants cherry-picked evidence to fit their narrative that no such harm to the human environment took place. The Decision should be set aside.

Finally, the notice of the interim rule removing CEQ's regulations explained how agencies may rely on the version of CEQ regulations that were in effect when the challenged agency action was completed.[8] BLM relied on the version of CEQ regulations that called for

---

[8] *See* https://ceq.doe.gov/docs/laws-regulations/CEQ-Interim-Final-Rule-Pre-publication-Version.pdf  at 13, 14.

implementing an EA and FONSI in lieu of an EIS. However, under *Marin*, this reliance remains precarious. The Court made clear that no statute *ever* granted CEQ the authority to issue binding regulations. If this is the case, the notice of CEQ's regulation removal does not justify BLM's questionable reliance on CEQ regulations in creating the EA and FONSI. In fact, it calls the entire TMP into question, as CEQ regulations underpin most of BLM's decisions in the TMP's creation.

Whether the Court follows traditional CEQ regulations, which would require BLM to implement an EIS instead of an EA, or adheres to the precedent set in *Marin*, Plaintiffs' request remains unchanged: we ask that the Court set aside the TMP.

## II.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT RELIEF.

Plaintiffs can demonstrate three types of irreparable harm: (1) Defendants are currently in the process of "obliterate[ing]" trails. EA at 270-71. (2) Plaintiff Wells will be denied access to his family land, the historic Marsing Ranch, and (3) Plaintiff Wells and Plaintiff Sage Riders, along with Plaintiff BlueRibbon and Sage Riders' members will no longer be able to travel the routes as they had planned.

Defendants' plan to "obliterate" the trails constitutes irreparable harm, as obliterated routes have a scarce history of ever being reconstructed and reopened. *See* Exhibit A at A-2, ¶ 6 ("Burr Declaration"). The EA is full of detailed explanations of their plans to "disguise routes" and obliterate the closed routes through "route reclamation." EA at 270-71. BLM lists varying ways in which they will "obliterate" routes. *Id*. Examples are "ripping and reseeding [routes], where BLM mechanically breaks up the route and reseeds it using heavy equipment", and the use of "tools such as shovels, rakes, and other hand tools . . . to obliterate tracks" *Id*. BLM may also install barriers, fences, and signs to stop travel on the routes. *Id*.

When people think of travel closures, they often think of the way in which manicured, paved roads are managed. That usually involves easily moveable signs and barriers with the road itself being left untouched. The closures here are vastly different. Once the route is closed, it is destroyed and gone forever. No such route will ever be remade because it is illegal to create new routes within the TMA. *See* 43 C.F.R. Part 8340. If the Court does not grant Plaintiffs a preliminary injunction, Defendants' will no doubt begin obliterating routes, and Plaintiffs will be forbidden from ever remaking them.

Destruction of these routes constitutes an irreversible harm to not only Plaintiffs, but the American people. This area has a longstanding history of responsible OHV use, which is made apparent by how beautiful these trails are even after such popularity. Thus, keeping these trails open would simply maintain the status quo.

BLM has also denied Plaintiff Wells access to a meaningful piece of his family heritage, the Marsing Ranch. BLM's closure of routes SS1404, SS1404A, and SS1235 cut off all public access to the Marsing Ranch despite decades of responsible, singletrack motorized use. *See* Wells Declaration at ¶¶ 8, 9 and Anderson Declaration ¶ 7. BLM tries to rectify these closures by citing routes SS1234A, SS1403, SS1001, and SS1547B as alternative access to the Marsing Ranch, but as discussed previously, a simple viewing of the map makes clear that this is untenable. Routes SS1234A and SS1403 are over a mile away, SS1001 is located atop a cliff about 1,000 feet above the ranch, requiring a dangerous descent, and SS1403, the closest route, requires crossing private property. For Plaintiff Wells, the Marsing Ranch is much more than just a "random historical place in the desert." *See* Wells Declaration ¶ 4. It is a place where he enjoys feeling connected to both his family and heritage. *Id*.

Further, routes SS1404, SS1404A, and SS1235 are the sole means of providing direct public access to the State Trust Land on which the Marsing Ranch sits. The BLM must allow the State of Utah "reasonable access" to state lands that is "not so narrowly restrictive as to render the lands incapable of their full economic development." *State of Utah v. Andrus*, 486 F.Supp. 995 (D. Utah Oct. 1, 1979 [Cotter Decision]). Closing these routes would prevent access to State Trust Land, and offering alternative access through far-out, indirect routes does not mitigate this.

### III.    RELIEF IS NOT ADVERSE TO THE PUBLIC INTEREST AND PLAINTIFFS' INJURIES OUTWEIGH ANY ALLEGED DAMAGE TO DEFENDANTS.

No meaningful harm to the other parties is present here. These routes have been open for close to two decades with no issue, so leaving them open will not result in any harm to BLM or any other interested party. Keeping these routes open will simply maintain the *status quo*.

Conversely, BlueRibbon's members, Sage Riders members, and Paul Wells all have concrete plans to travel these routes via OHV. They will undoubtedly suffer substantial harm if almost 31% of the routes in the TMA are closed and obliterated by the BLM. The loss to the American people of these prized routes–enjoyed by thousands upon thousands of people for decades–is permanent and profound every single year. Public interest favors an injunction, as closing almost 31% of the routes in the TMA will have a significant impact on the public's ability to continue their enjoyment of this public land.

Political representatives have also officially supported keeping the routes open. Senator Mike Lee introduced legislation in 2023 that would prohibit federal money from being used to enact new travel plans. The bill would also delay the implementation of new travel plans until applicable court cases have been completed. Unfortunately, it was threatened by a veto by President Biden and not passed in the previous Congress. However, this bill has just been

reintroduced as a joint effort between Senator Mike Lee and Senator John Curtis, with
Representative Mike Kennedy introducing it as his first piece of legislation in the House of
Representatives. *Lee, Curtis, Kennedy Introduce Historic Roadways Protection Act,* Press
Release (January 25, 2025), available at: https://www.lee.senate.gov/2025/1/lee-curtis-introduce-
historic-roadways-protection-act

Finally, it is within the public interest to hold BLM accountable with applicable law.
*Seattle Audubon Soc'y v. Evans,* 771 F. Supp. 1081, 1096 (W.D. Wash. 1991) ("refusal of
administrative agencies to comply with [the law] . . . invokes a public interest of the highest
order"). The issues raised in this appeal warrant a preliminary injunction, as BLM failed to
respond to significant public commentary, provide legitimate rationales for route closures, and
deprived Plaintiffs of their right to appeal to the IBLA.

## IV.    ALTERNATIVELY, THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION BUT NO BOND SHOULD BE REQUESTED IF THE COURT ISSUES THE INJUNCTION.

Section 705 of the APA specifically authorizes courts to "issue all necessary and
appropriate processes to postpone the effective date of an agency action or to preserve status or
rights pending conclusion of the review proceedings." 5 U.S.C. § 705. If the Court is not inclined
to provide relief under Section 705, it can provide relief by issuing a preliminary injunction
under Federal Rule of Civil Procedure 65 as the factors are substantively the same. *See Colorado
v. United States EPA*, 989 F.3d at 883. Finally, the Court should waive the requirement for
Plaintiffs to post a bond. Fed. R. Civ. P. 65(c). In the alternative, it should only require a nominal
bond of $1,000 or less. Trial courts possess "wide discretion under Rule 65(c) in determining
whether to require security." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009).
Here, Plaintiffs are advocacy organizations and an activist seeking to enforce their statutory

rights, and Defendants face no direct monetary harm if an injunction is granted. Because a preliminary injunction in this case "enforces fundamental constitutional rights against the government . . . [w]aiving the security requirement best accomplishes the purposes of Rule 65(c)." *United Utah Party v. Cox*, 268 F. Supp. 3d 1227, 1260 (D. Utah 2017).

### V.    ALTERNATIVELY, PLAINTIFFS REQUEST THE COURT ORDER DEFENDANTS TO NOT OBLITERATE ROUTES UNTIL THE END OF THIS CASE.

In the second alternative, Plaintiffs request the Court order Defendants to only allow natural reclamation of the closed routes and not mechanically destroy routes while this case is pending. Doing so would prevent the closed routes from premature permanent erasure and allow the case to be resolved while limiting damage to the routes.

### CONCLUSION

Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

Date: March 6, 2025

BLUERIBBON COALITION, INC.
*/s/ Isabella Eldridge*
Isabella Eldridge
*Attorney for Plaintiffs*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on March 6, 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the District of Utah by using the CM/ECF system, which will serve a copy of the same on all counsel of record.

*/s/ Isabella Eldridge*

Isabella Eldridge