Stephen H.M. Bloch (#7813)
Laura Peterson (#16135)
Hanna Larsen (#18458)
SOUTHERN UTAH WILDERNESS ALLIANCE
425 East 100 South
Salt Lake City, Utah 84111
Telephone: (801) 486-3161
steve@suwa.org
laura@suwa.org
hanna@suwa.org

*Attorneys for Proposed Defendant-Intervenor*
*Southern Utah Wilderness Alliance*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH CENTRAL DIVISION, SOUTHERN REGION

| | |
|---|---|
| **BLUERIBBON COALITION, INC.**, *et al.*, | Case No. 4:25-cv-00022-DN |
| Plaintiffs, | |
| v. | **RESPONSE AND MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR RELIEF UNDER 5 U.S.C. § 705 OR, ALTERNATIVELY, FOR A PRELIMINARY INJUNCTION** |
| **BUREAU OF LAND MANAGEMENT**, *et al.*, | |
| Defendants, | |
| and | Judge David Nuffer |
| **SOUTHERN UTAH WILDERNESS ALLIANCE**, | |
| Proposed Defendant-Intervenor. | |

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................. 2

    I.   San Rafael Swell ............................................................................................... 2

    II.   Prior Travel Planning in the Price and Richfield Field Offices ....................... 3

    III.  San Rafael Swell Travel Planning .................................................................... 3

LEGAL BACKGROUND ................................................................................................... 4

    I.   Regulation of Off-Highway Vehicles ............................................................... 4

    II.   National Environmental Policy Act .................................................................. 6

LEGAL STANDARD .......................................................................................................... 7

ARGUMENT ....................................................................................................................... 8

    I.   Plaintiffs Are Not Likely to Succeed on the Merits ......................................... 8

        A.   Dingell Act .............................................................................................. 9

        B.   Arbitrary and Capricious Agency Action ............................................. 14

        C.   NEPA ..................................................................................................... 19

    II.   Plaintiffs Will Not Suffer Immediate and Irreparable Harm .......................... 22

        A.   "Obliteration" of Closed Routes ........................................................... 22

        B.   Denied Access to Marsing Ranch .......................................................... 24

        C.   Inability to Travel Closed Routes .......................................................... 24

    III.  Injury to SUWA's Interests Outweighs Any Injury to Plaintiffs ................... 25

    IV.  The Public Interest Favors Denying Preliminary Relief ................................ 27

CONCLUSION .................................................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Am. Motorcyclist Ass'n v. Watt*, 534 F. Supp. 923 (C.D. Cal. 1981)............................................ 27

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87 (1983)......................... 20

*BlueRibbon Coal. v. Bureau of Land Mgmt.*,
   No. 2:23-cv-923, 2024 U.S. Dist. LEXIS 49991 (D. Utah March 20, 2024).......... 12, 24, 25, 26

*Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*,
   75 F.3d 1429 (10th Cir. 1996)....................................................................................... 26

*Colo. Wild v. U.S. Forest Serv.*, 299 F. Supp. 2d 1184 (D. Colo. 2004) ..................................... 28

*Colo. Wild v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213 (D. Colo. 2007) ..................................... 28

*Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874 (10th Cir. 2021)............................... 8, 23, 24

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
   746 F. Supp. 2d 1055 (N.D. Cal. 2009) ...................................................................... 6

*Ctr. for Biological Diversity v. U.S. Dept. of the Interior*,
   72 F.4th 1166 (10th Cir. 2023)....................................................................... 7, 21, 22

*Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).................. 8

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ........................................................................... 25

*King v. IC Grp., Inc.*, 743 F. Supp. 3d 1346 (D. Utah 2024)....................................................... 18

*Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902 (D.C. Cir. 2024)....................... 18

*Marin Audubon Soc'y v. Fed. Aviation Admin.*,
   2025 U.S. App. LEXIS 2237 (D.C. Cir. Jan. 31, 2025)............................................. 18

*Motor Vehicle Mfrs Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29 (1983)............................... 15

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*,
   854 F.3d 1236 (10th Cir. 2017)................................................................................. 23

*Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245 (D.D.C. 1977) .............................................. 28

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ......................................................... 18, 19

*Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560 (10th Cir. 1994) .......................................... 7

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ...................................... 6, 20

*S. Utah Wilderness All. v. Burke*, 908 F.3d 630 (10th Cir. 2018) ................................................... 3

*S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099 (D. Utah 2013) ..................................... 5

*Utah Shared Access All. v. Carpenter*, 463 F.3d 1125 (10th Cir. 2006) ................................. 5, 19

*Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205 (10th Cir. 2002) .......................... 20

*WildEarth Guardians v. Conner*, 920 F.3d 1245 (10th Cir. 2019) ...................................... 6, 7, 20

*Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008) ......................................................... 8, 22, 26

**Statutes**

42 U.S.C. § 4321 ............................................................................................................................ 6

42 U.S.C. § 4332 ............................................................................................................................ 6

43 U.S.C. § 1701 ..................................................................................................................... passim

43 U.S.C. § 1702 ............................................................................................................................ 5

43 U.S.C. § 1732 ..................................................................................................................... 16, 19

5 U.S.C. § 702 ................................................................................................................................ 7

5 U.S.C. § 706 ................................................................................................................................ 7

John D. Dingell, Jr. Conservation, Management, and Recreation Act,
Pub. L. No. 116-9, 113 Stat. 580 (2019) ...................................................................... 9, 10, 13

**Regulations**

40 C.F.R. § 1501.3 (2024) ........................................................................................................... 21

40 C.F.R. § 1501.6 (2024) ............................................................................................................. 7

40 C.F.R. § 1508.1 (2024) ............................................................................................................. 6

43 C.F.R. § 8342.1 ................................................................................................................... 5, 18

**Other Authorities**

Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 9, 1972) .......................................................... 5

Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 25, 1977) ....................................................... 5

Memorandum from the Council on Env't Quality to the Heads of Fed. Dep'ts and Agencies
    (Feb. 19, 2025) ........................................................................................................................ 7

U.S. Dep't of the Interior, 109 DM 7 (2013) ............................................................................... 17

## INTRODUCTION

Plaintiffs challenge the Bureau of Land Management's (BLM) December 31, 2024 Decision Record (DR) for the San Rafael Swell Travel Management Plan (TMP).[1] BLM's plan designated 1,496 miles of dirt roads and trails in the San Rafael Swell for public motorized vehicle use and closed 665 miles to such use.[2] The San Rafael Swell is a spectacular Utah landscape, punctuated by narrow canyons and soaring redrock cliffs, that is popular with recreationists and home to significant sensitive natural and cultural resources.

While BLM designated 665 miles of routes as closed, only 158 miles of those routes were previously open to motorized use, whereas 507 miles were unavailable to such use prior to BLM's 2024 San Rafael Swell TMP decision.[3] BLM's decision also opened 240 miles of new routes to motorized use.[4] Plaintiffs are asking the court for emergency relief to enjoin a decision that ultimately increases the number and mileage of routes open for motorized use in the San Rafael Swell Travel Management Area (TMA).

Proposed Defendant-Intervenor Southern Utah Wilderness Alliance (SUWA) opposes the Plaintiffs' Motion for Relief Under 5 U.S.C. § 705 or, Alternatively, for a Preliminary Injunction (Motion).[5] Plaintiffs have completely failed to meet their burden for this extraordinary relief and

---

[1] Bureau of Land Mgmt., *Decision Record: San Rafael Swell Travel Management Plan*, DOI-BLM-UT-G020-2019-0019-EA (Dec. 2024) (DR). The documents supporting BLM's decision, including the DR, Environmental Assessment, Finding of No Significant Impact, and individual route reports are available on BLM's ePlanning website.
[2] DR at DR-2.
[3] *Id.*
[4] *Id.*
[5] Pls.' Mot. for Prelim. Inj., ECF No. 4 (Mot.). Plaintiffs BlueRibbon Coalition, Inc., Sage Riders Motorcycle Club, and Paul Wells are collectively referred to as "Plaintiffs."

thus are not entitled to any form of immediate or preliminary relief under 5 U.S.C. § 705 or Fed. R. Civ. P. 65.

To avoid duplicative briefing, SUWA adopts and incorporates Federal Defendants' Memorandum in Opposition to Motion for Preliminary Injunction (U.S. Opposition).[6]

## FACTUAL BACKGROUND

### I.    San Rafael Swell

The San Rafael Swell TMA encompasses over 1.1 million acres of BLM-managed lands in southeastern Utah and within the agency's Price and Richfield Field Offices.[7] The Swell is home to desert bighorn sheep, pronghorn, and several Endangered Species Act-listed species.[8] Fragile biological soil crusts, which are easily harmed or destroyed when disturbed, occur throughout the TMA.[9] The area also contains several streams and important riparian areas.[10]

The San Rafael Swell TMA encompasses significant cultural sites reflecting thousands of years of human history, including rock imagery panels, ceramics, and stone tools, as well as historic cabins, camps, and mining sites.[11]

The area draws hikers, backpackers, climbers and canyoneers from around the country and is also a popular location for motorized recreation.[12] The TMA encompasses several recently designated wilderness areas and the San Rafael Swell Recreation Area.[13]

---

[6] Defs.' Opp'n to Mot. for Prelim. Inj., ECF No. 21 (U.S. Opp'n).
[7] Bureau of Land Mgmt., *Environmental Assessment: San Rafael Swell Travel Management Plan*, DOI-BLM-UT-G020-2019-0019-EA, 4-5 (Dec. 2024) (EA).
[8] *Id.* at 130-33, 179-81.
[9] *Id.* at 92-96.
[10] *Id.* at 110-13.
[11] *Id.* at 36-40.
[12] *Id.* at 205-241.
[13] *Id.* at 2.

## II.    Prior Travel Planning in the Price and Richfield Field Offices

Prior to BLM's decision in this matter, off-highway vehicle (OHV) use in the San Rafael Swell TMA was governed by the 2008 Price and Richfield Resource Management Plans ("Price RMP" and "Richfield RMP," respectively).[14] Those plans and their contemporaneously-issued TMPs designated 5,015 miles of routes for public motorized use throughout the field offices, including approximately 1,429 miles within the San Rafael Swell TMA.[15] SUWA and other conservation organizations challenged the Price and Richfield RMPs, TMPs, and other plans also issued in 2008, for violating federal environmental and historic preservation laws. After nearly a decade of litigation, SUWA, the Interior Department, Plaintiff BlueRibbon Coalition, and others reached a settlement agreement that directed BLM to prepare eleven new travel plans, including the San Rafael Swell TMP at issue in this case.[16]

## III.    San Rafael Swell Travel Planning

BLM initiated a 30-day scoping period for the San Rafael Swell TMP in February 2021.[17] In June 2024, BLM released a draft Environmental Assessment (EA) for the San Rafael Swell TMP for a 45-day comment period.[18]

On December 31, 2024, BLM released its final EA, DR and Finding of No Significant

---

[14] Bureau of Land Mgmt., *Price Field Office Record of Decision and Approved Resource Management Plan,* 113-14 (Oct. 2008) (Price RMP); Bureau of Land Mgmt., *Richfield Field Office Record of Decision and Approved Resource Management Plan,* 122-27 (Oct. 2008) (Richfield RMP); *see also* EA at 1.

[15] Price RMP at 114; Richfield RMP at 126; DR at DR-2.

[16] *See generally S. Utah Wilderness All. v. Burke*, 908 F.3d 630 (10th Cir. 2018).

[17] EA at 16.

[18] *Id.* at 141.

Impact (FONSI) for the San Rafael Swell TMP.[19] The final EA analyzed five alternative route networks: the No-Action Alternative and four action alternatives that would designate between 1,191 and 2,110 miles for public motorized use.[20]

The final EA also outlined the impacts of the alternative travel networks as well as the potential for each travel network to comply with the minimization criteria. Accompanying the EA, BLM also released route-specific reports discussing each route individually.[21]

In the DR, BLM selected Alternative E, which drew from several alternatives analyzed in the draft EA.[22] The new travel plan designates 1,496 miles for public OHV use and closes 665 miles to public OHV use.[23] This amounts to a net increase of 67 miles of dirt roads and trails designated for motorized use in the TMA.

## LEGAL BACKGROUND

### I.    Regulation of Off-Highway Vehicles

The Federal Land Policy and Management Act (FLPMA) requires that BLM manage public lands for multiple uses and in a manner that "will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource and archeological

---

[19] *See generally* DR; EA; Bureau of Land Mgmt., *Finding of No Significant Impact: San Rafael Swell Travel Management Plan*, DOI-BLM-UT-G020-2019-0019-EA (Dec. 31, 2024) (FONSI).
[20] EA at 24.
[21] *See generally* Bureau of Land Mgmt., *Final Route Reports*, DOI-BLM-UT-G020-2019-0019-EA (the "Final Route Reports" section is a series of nine documents).
[22] DR at DR-1.
[23] *Id.*

values . . . ."[24] Recreation, including OHV use, is one of those multiple uses for which BLM must manage.[25]

In response to the growing use of OHVs on public lands and the resulting environmental damage caused by that activity, Presidents Nixon and Carter issued executive orders mandating that federal agencies like BLM only allow OHV use on public lands in a manner that protects lands and natural resources.[26] BLM subsequently promulgated 43 C.F.R. § 8342.1—often referred to as the "minimization criteria"—which governs how BLM designates areas and trails for OHV use on public lands.[27]

BLM must apply the minimization criteria on both a route-by-route and travel network-wide basis[28] and provide a reasonable articulation of the basis for the conclusion that such designations "minimize" impacts to important resources.[29] Minimize refers "to the <u>effects</u> of route designations, i.e. the BLM is required to place routes specifically to minimize 'damage' to

---

[24] 43 U.S.C. § 1701(a)(7), (8).

[25] *See id.* § 1702(c); *Utah Shared Access All. v. Carpenter*, 463 F.3d 1125, 1129 (10th Cir. 2006).

[26] Exec. Order No. 11,644, 37 Fed. Reg. 2,877 (Feb. 9, 1972); Exec. Order No. 11,989, 42 Fed. Reg. 26,959 (May 25, 1977).

[27] 43 C.F.R. § 8342.1(a)-(d).

[28] *See S. Utah Wilderness All. v. Burke*, 981 F. Supp. 2d 1099, 1104 (D. Utah 2013), *vacated sub nom. S. Utah Wilderness All. v. U.S. Dep't of the Interior*, No. 2:12-cv-257-DAK, 2017 WL 11516766 (D. Utah May 17, 2017).

[29] *See id.* at 1104-06.

public resources, 'harassment' and 'disruption' of wildlife and its habitat, and minimize 'conflicts of uses.'"[30]

## II.    National Environmental Policy Act

Congress enacted the National Environmental Policy Act (NEPA) "to promote efforts which will prevent or eliminate damage to the environment."[31] NEPA serves two primary purposes. First, it "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" of a proposed action.[32] Second, it requires "that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."[33]

If an agency is proposing a "major Federal action significantly affecting the quality of the human environment" it must prepare an environmental impact statement (EIS)—an extensive analysis assessing all predictable environmental impacts and "comparing the proposed action to all reasonable alternatives."[34] If it is unclear whether the proposed action will significantly affect the environment, the agency must first prepare an EA.[35] An EA is "a concise public document…that is used to support an agency's determination of whether to prepare an [EIS]…or

---

[30] *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1080 (N.D. Cal. 2009) (emphasis in original).
[31] 42 U.S.C. § 4321.
[32] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).
[33] *Id.*
[34] 42 U.S.C. § 4332(2)(C); *WildEarth Guardians v. Conner*, 920 F.3d 1245, 1251 (10th Cir. 2019).
[35] *Conner*, 920 F.3d at 1251.

a [FONSI]."[36] "If the EA concludes that the proposed action will have no significant effect on the environment, the agency may issue a FONSI and move forward with the proposed action. Otherwise, the agency must prepare an EIS."[37]

## LEGAL STANDARD

### I.     Administrative Procedure Act

Judicial review of agency actions under FLPMA, NEPA, and their implementing regulations is governed by the Administrative Procedure Act (APA), which provides review for "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."[38] Under the APA, a court will set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[39] The court must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made."[40]

### II.     Preliminary Relief

Preliminary relief is an "extraordinary remedy never awarded as of right."[41] To obtain a preliminary injunction, a movant must show:

> (1) it is substantially likely to succeed on the merits, (2) it will suffer irreparable injury if the injunction is denied, (3) its threatened injury

---

[36] 40 C.F.R. § 1508.1(j) (2024). All citations to NEPA's implementing regulations are to those in effect when the San Rafael Swell DR was signed. *See Ctr. for Biological Diversity v. U.S. Dept. of the Interior*, 72 F.4th 1166, 1178, n.6 (10th Cir. 2023); Memorandum from the Council on Env't Quality to the Heads of Fed. Dep'ts and Agencies, 1 (Feb. 19, 2025).

[37] *Conner*, 920 F.3d at 1251 (internal quotation marks and citations omitted); *see also* 40 C.F.R. § 1501.6(a) (2024).

[38] 5 U.S.C. § 702.

[39] *Id.* § 706(2)(A).

[40] *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994) (footnote omitted).

[41] *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).

outweighs the injury the opposing party will suffer under the injunction, and (4) the injunction would not be adverse to the public interest.[42]

A movant must satisfy all four factors.[43] These same four factors "also determine when a court should grant a stay of agency action" pursuant to 5 U.S.C. § 705.[44]

## ARGUMENT

For the reasons stated herein and in the U.S Opposition, Plaintiffs have failed to meet any (let alone all) of the factors necessary to obtain preliminary relief pursuant to under 5 U.S.C. § 705 or Fed. R. Civ. P. 65. Their motion should be denied.

### I.    Plaintiffs Are Not Likely to Succeed on the Merits

Plaintiffs allege three causes of action in their Complaint: (1) BLM's OHV restrictions and closures are *ultra vires* and violate the John D. Dingell, Jr. Conservation, Management, and Recreation Act (Dingell Act);[45] (2) the San Rafael Swell TMP is arbitrary and capricious because specific routes were closed, a BLM District Manager did not sign the DR, and FLPMA does not provide the statutory basis for the minimization criteria; and (3) BLM violated NEPA by failing to analyze the TMP's impacts in an EIS.[46]

Plaintiffs' Motion fails to demonstrate that they are likely to succeed on the merits of any of these claims. To the contrary, Plaintiffs' claims are likely to fail.

---

[42] *Colorado v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883 (10th Cir. 2021) (internal quotation marks and citation omitted).
[43] *Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281-82 (10th Cir. 2016).
[44] *Colorado*, 989 F.3d at 883).
[45] Pub. L. No. 116-9, 113 Stat. 580 (2019).
[46] *See* Compl. ¶¶ 29-73, ECF No. 1.

### A.    Dingell Act

Plaintiffs allege that BLM violated the Dingell Act in two ways. First, that BLM improperly established a so-called "buffer zone" around designated wilderness areas and improperly considered potential impacts to wilderness.[47] Second, that the Dingell Act and Wild and Scenic Rivers Act require BLM to designate routes along and through the Price River.[48] Plaintiffs' arguments are unfounded and rely on an inaccurate and unsupported interpretation of the Dingell Act as well as a distortion of the DR.

Relevant here, the Dingell Act added 18 new areas within Emery County to the National Wilderness Preservation System as designated wilderness, including 14 areas within the San Rafael Swell TMA.[49] The Dingell Act also designated certain segments of the Green River within Emery County as Wild, Scenic or Recreational.[50] The Act does not mention or discuss the Price River.[51]

### 1.    The San Rafael Swell TMP did not create wilderness buffers.

The Dingell Act states that Congress "does not intend for the designation of the wilderness areas to create protective perimeters or buffer zones" and "that nonwilderness activities or uses can be seen or heard from areas within a wilderness area shall not preclude the conduct of those activities or uses" outside the designated wilderness.[52] Neither this language, nor any other language in the Dingell Act prohibits BLM from closing routes near wilderness.

---

[47] Mot. 8-10.
[48] *Id.* at 10-11.
[49] *See* Dingell Act § 1231(a); EA at 2.
[50] Dingell Act § 1241(a).
[51] *Id.*
[52] *Id.* § 1232(e).

The Act also does not prohibit BLM from considering impacts to resources, including wilderness, in compliance with the minimization criteria set forth in 43 C.F.R. § 8342.1. Indeed, contrary to what Plaintiffs imply, the Dingell Act does not <u>require</u> BLM to allow certain activities that impact wilderness, it merely states that wilderness designation does not in and of itself preclude these activities from occurring outside those areas.[53] Thus, the plain language of the Act does not support Plaintiffs' claims.

Importantly, BLM did not create any buffer zone around wilderness areas. BLM designated many routes for motorized use that border wilderness areas, lead to wilderness areas or are in close proximity to them. In fact all 14 wilderness areas within the TMA are bordered at least in part by a route open to OHV use.[54] For instance, BLM designated for motorized use routes SS3327 and SS3328 which together run nearly 11 miles, roughly along the western boundary of the Cold Wash Wilderness Area.[55] Many other routes BLM designated as open to motorized use lead to or access wilderness areas.[56] BLM opened route SS2492 to OHV use—which leads to the San Rafael Reef Wilderness—in part to "provid[e] access to an undeveloped campsite and opportunities for canyoneering, rock climbing and sightseeing."[57] Similarly, BLM opened route SS4302 near the Muddy Creek Wilderness to motorized use to, *inter alia*, "provid[e] access to dispersed campsites near Crack Canyon."[58]

---

[53] *See id.*
[54] *See* DR at DR-12-17.
[55] *Id.* at DR-289.
[56] *See id.*
[57] *See id.* at DR-185.
[58] *See id.* at DR-399

Even Plaintiffs' edited map excerpts fail to support their argument that BLM created a wilderness buffer.[59] Plaintiffs' map of the purported buffer around Mexican Mountain Wilderness shows at least eight open routes that are within the alleged buffer.[60] Similarly, Plaintiffs' Sids Mountain map shows twelve open OHV routes within the purported buffer.[61] As a practical matter, BLM did not create a buffer zone around wilderness.

Moreover, none of the examples Plaintiffs provide demonstrate that BLM either improperly closed motorized routes or ran afoul of the Dingell Act. Plaintiffs allege that the Dingell Act requires "all access roads and trails that support [cherry stemmed] routes" to be open to motorized use "or else BLM will inevitably create illegal 'buffer zones,'" referencing routes SS3331, SS3332, SS3333, SS3334, SS3335, and SS3345.[62] Plaintiffs do not cite any provision of the Dingell Act to support their claim, but rather cite to the Plaintiff Sage Riders' Comments.[63] Nothing in the Dingell Act requires BLM to open specific routes to motorized use.

---

[59] *See* Compl. ¶ 37.

[60] *Id.* (depicting routes SS2176, SS2174A, SS2174, SS2189, SS2199, SS2204, SS2209, and SS2205 in green, which means "open" to OHV use, despite being within Plaintiff's purported buffer); *see also* Bureau of Land Mgmt., *San Rafael Swell TMP Interactive Map* (last visited April 9, 2025) (Interactive TMP Map) (providing route numbers for routes designated as open, limited or closed).

[61] *See* Compl. ¶ 37 (showing routes SS3327, SS3328, SS3323, SS3322, SS3353, SS3354, SS3366, SS3368, SS3370, SS3375, SS3376, SS3380, in green or "open" to OHV use, within Plaintiffs' purported buffer); Interactive TMP Map.

[62] Mot. 8 (emphasis in original).

[63] *Id.* Further, most of the specified routes, including SS3331, SS333, SS3334, SS3345 and most of SS3332 were closed to OHVs in 2017 when Congress passed the Dingell Act, so Plaintiffs are arguing that Congress intended to require BLM to allow motorized use above and beyond that which was legally authorized when Congress passed the legislation. *See* DR at DR 290-91; DR-294 (noting these routes were closed to OHV use in the no action alternative).

Instead, the Dingell Act maintains BLM's discretion to designate routes in compliance with applicable law.[64] BLM exercised that discretion here.

Plaintiffs do not highlight any route decisions that show BLM violated the Dingell Act.[65] For example, BLM provided a lengthy rationale for its decision to close route SS3115, including that motorized use of the route "has the potential to affect resources, including an [Area of Critical Environmental Concern], cryptobiotic soils," and other specifically identified resources.[66] Nowhere in this articulated reasoning does BLM mention or imply that it is closing the route to protect wilderness.[67] BLM also provided multiple reasons for closing routes SS5021, SS5022 and SS5023, including minimizing potential impacts to special status species and erosive soils.[68] BLM acknowledges that closing these routes will also "support[] the protection of Congressionally Designated Wilderness" but nothing in the Dingell Act prevents BLM from acknowledging beneficial impacts to wilderness in its route designation decisions.[69] Likewise, BLM's analyses of routes SS2174B, SS2176B, SS2182 and SS2186 do not demonstrate any intent to create or the creation of a wilderness buffer. BLM highlighted multiple reasons to close the routes, including impacts to Mexican spotted owl habitat, among other resources.[70] The DR reflects BLM's analysis of OHV impacts and attempts to minimize those impacts as required by

---

[64] *BlueRibbon Coal. v. Bureau of Land Mgmt.*, No. 2:23-cv-923, 2024 U.S. Dist. LEXIS 49991, *16-18 (D. Utah March 20, 2024).
[65] Mot. 8-10.
[66] DR at DR-256.
[67] *Id.*
[68] *Id.* at DR-437.
[69] *See id.* at DR-437; Dingell Act § 1232(e).
[70] DR at DR-139-41.

law. It does not reflect any intention to create a wilderness buffer. Plaintiffs' arguments should
be rejected.

> 2.    *BLM did not violate the Dingell Act when it closed routes near the Price
> River.*

Next, Plaintiffs claim that because Congress designated certain segments of the <u>Green</u>
River as Wild, Scenic, or Recreational, Congress somehow intended the Dingell Act to also
require BLM to open certain routes to motorized use along and to the <u>Price</u> River.[71] The Act
does no such thing. As Plaintiffs acknowledge, the Act does not mention or reference the Price
River.[72] To infer from that silence a clear congressional intent for BLM to do anything related to
the Price River, let alone a requirement that BLM designate specific motorized routes near the
Price River, is a bridge too far. Neither the statutory text nor any relevant case law supports
Plaintiffs' interpretation of the Dingell Act; nor do they cite to any.[73]

Instead, BLM's rationales for closing the routes Plaintiffs complain about demonstrate
BLM's analysis of OHV impacts to the Price River area. For instance, discussing its decision to
close route SS1235, BLM notes that it intended to protect "riparian areas, crucial water sources
for big game," and wildlife habitat.[74] Its decision to "encourage only non-motorized access along
the Price River" was specifically "to help protect the sensitive resources."[75] BLM explained that
its decisions to close routes SS1404 and SS1404A were also meant to protect sensitive resources,
including riparian areas and important habitats.[76] Further, the Price River is an impaired

---

[71] *See* Mot. 10-11.
[72] *Id.* at 10.
[73] *See id.* at 10-11.
[74] DR at DR-56.
[75] *Id.*
[76] *Id.* at DR-81-82.

waterway, the best management practices for which are to "limit[] OHV use to non-sensitive areas away from streams."[77] These individual route decisions do not create some sort of *de facto* "Wild River" as Plaintiffs contend, but rather reflect BLM's application of the minimization criteria, as required by law.

In sum, Plaintiffs have failed to show that they will likely succeed on their Dingell Act claims.

### B.    Arbitrary and Capricious Agency Action

Plaintiffs next allege a grab bag of claims that the San Rafael Swell TMP is arbitrary and capricious because (1) it restricts access to Marsing Ranch; (2) BLM closed route SS2070 while SS2072 remains open; (3) Plaintiffs were denied the right to administratively appeal the TMP prior to it going into effect; and (4) FLPMA does not provide the statutory basis for the minimization criteria codified at 43 C.F.R. § 8342.1.[78] Plaintiffs have come nowhere close to demonstrating that the Court is likely to find any of these decisions arbitrary and capricious. To the contrary, the Court may easily conclude there is a "rational connection between the facts found and the choice made."[79]

### 1.    *BLM is not required to provide public motorized access to Marsing Ranch.*

Plaintiffs allege that it was arbitrary and capricious for BLM to close routes SS1404, SS1404A, and SS1235 to OHVs because doing so would preclude access to the "Marsing Ranch," located on Utah Trust Lands Administration property.[80] This claim relies heavily on

---

[77] EA at 113.

[78] *See* Mot. 11-15.

[79] *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983).

[80] Mot. 11-13.

Plaintiff Wells' declaration alleging his family's ties to Marsing Ranch and that the closures of SS1404, SS1404A, and SS1235 "provide the only public access for [him] and [his] family to enjoy [their] family connection to this site."[81] While this may be so, one person's historic connection to a location is not enough to render BLM's decision arbitrary and capricious.

BLM is not required to provide public motorized access to the Marsing Ranch and Plaintiffs have not pointed to any regulation or legal decision to the contrary. The designations in the San Rafael Swell TMP do not affect non-motorized use and the DR specifically states that "[n]on-motorized use within the TMA is allowed regardless of OHV designations (*e.g.*, hikers and horseback riders are not restricted to designated OHV routes)."[82] Thus, the public, including Mr. Wells, may utilize non-motorized means to access the property, which is precisely how Mr. Wells' ancestors accessed Marsing Ranch.[83]

### 2. *BLM properly exercised its discretion to close route SS2070.*

Plaintiffs next allege that BLM acted arbitrarily and capriciously by closing to motorized vehicles route SS2070, but not route SS2072, when both routes "exist within a homogenous network for dispersed camping along the Mexican Mountain [W]ilderness."[84]

Routes SS2070 and SS2072 are part of a number of short routes that all branch off a five-mile stretch of San Rafael River Road and lead to the border of the Mexican Mountain Wilderness. BLM left roughly half of these short routes open to OHVs and closed the other half. BLM explained its approach as providing "sustainable motorized access for dispersed campsites

---

[81] Compl. Ex. A-3 (Wells Decl.) ¶ 4, ECF No. 1-1.
[82] DR at DR-4.
[83] Wells Decl. ¶¶ 5, 6 (detailing how routes SS1404 and SS1404A were used in the 1900s "by horseback" to access the Marsing Ranch).
[84] Mot. 13.

and other recreational activities near the river" while simultaneously "reduc[ing] impacts to resources in the Mexican Mountain area."[85] Thus, BLM properly exercised its discretion to open certain routes and close others based on the agency's impacts assessments and the existence of other, redundant routes in the same area. Rather than being arbitrary and capricious, this an example of rational decision-making that adheres to BLM's duties under FLPMA.[86]

3. *The Principal Deputy Assistant Secretary, Lands and Minerals Management properly signed the San Rafael Swell TMP.*

Third, Plaintiffs claim that it was arbitrary for Steven Feldgus, the Interior Department's Principal Deputy Assistant Secretary for Lands and Minerals Management, to sign the DR for the San Rafael Swell TMP because doing so precluded Plaintiffs from appealing the TMP to the Interior Board of Land Appeals (IBLA).[87] Plaintiffs argue that BLM's decision to have Mr. Feldgus authorize the TMP was arbitrary and capricious because (1) BLM did not explain its reasoning for doing so; and (2) other travel plans in Utah historically have been signed by a BLM district manager rather than someone in Mr. Feldgus's position.[88]

There was no need for BLM to explain this decision. Mr. Feldgus was directly responsible for programs associated with land use planning and public land management, including providing Secretarial direction and supervision over BLM.[89] Logically, if a BLM district manager is authorized to sign the TMP, then someone in a higher-ranking, supervisory position (such as Mr. Feldgus) is likewise authorized to do so. Such authority is inherent in the

---

[85] DR at DR-126.
[86] *See* 43 U.S.C. §§ 1701(a)(8), 1732(b).
[87] Mot. 13-14.
[88] *Id.* at 14.
[89] U.S. Dep't of the Interior, 109 DM 7 §§ 7.1, 7.3 (2013) (attached as Ex. 1).

Interior Department's and BLM's organizational structure and thus no explanation regarding the choice of signatory (particularly when that signatory is specifically tasked with overseeing BLM's actions) is necessary.

The Interior Department followed this same approach in 2008 when another Assistant Secretary signed the Price and Richfield RMPs and TMPs, which meant that SUWA could not pursue an IBLA appeal of the TMP decisions.[90]

### 4. BLM properly relied on FLPMA and the minimization criteria.

Finally, Plaintiffs claim BLM arbitrarily relied on the minimization criteria at 43 C.F.R. § 8342.1 as a basis for designating routes.[91] According to Plaintiffs, the D.C. Circuit's decision in *Marin Audubon Society v. Federal Aviation Administration*[92] "made clear that agencies may not rely on regulations absent a 'clear, statutory basis'" and that FLPMA "does not provide a 'clear, statutory basis' for these minimization criteria."[93] This argument is entirely baseless: *Marin Audubon* is inapplicable and FLPMA provides the statutory support for the minimization criteria.

*First*, *Marin Audubon* is a D.C. Circuit decision and therefore not binding precedent in the Tenth Circuit.[94] *Second*, the *Marin Audubon* court's discussion regarding the statutory basis necessary to support regulations is narrowly focused on the Council on Environmental Quality's rulemaking authority under NEPA. *Third*, despite the *Marin Audubon* court's lengthy discussion

---

[90] *See* Price RMP at 55; Richfield RMP at 61.
[91] Mot. 14.
[92] 121 F.4th 902 (D.C. Cir. 2024).
[93] Mot. 14-15 (purportedly quoting *Marin Audubon*, though no pincite accompanies the quotes). SUWA's counsel could not find the quoted language in the opinion.
[94] *King v. IC Grp., Inc.*, 743 F. Supp. 3d 1346, 1354 (D. Utah 2024) ("Out-of-circuit decisions are not binding precedent on district courts in the Tenth Circuit") (citation omitted).

on this topic, it is dicta, not a case holding, so it does not carry the same persuasive value.[95]

Moreover, regardless of how the Court treats *Marin Audubon*, FLPMA expressly grants BLM statutory authority to promulgate binding regulations, including the minimization criteria. Congress enacted FLPMA for a wide variety of purposes including to provide high-level mandates and guidance regarding BLM-managed lands.[96] Specifically, FLPMA mandates that "[i]n managing the public lands [BLM] shall, <u>by regulation</u> or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands."[97] FLPMA thus inherently requires that BLM balance the protection of natural, scenic, and other resources with outdoor recreation opportunities in a manner that prevents unnecessary or undue degradation.[98]

BLM's minimization criteria regulation is specifically focused on regulating OHV recreation to ensure public land resources are protected.[99] The regulations adhere to FLPMA's general directive to protect natural, scenic, and other resources while providing for recreation.[100] They are also a prime example of BLM following FLPMA's mandate to take action, via regulation, "to prevent unnecessary or undue degradation" of public lands.[101] Contrary to Plaintiffs' assertions, the minimization criteria regulation stems from FLPMA's statutory

---

[95] *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 2025 U.S. App. LEXIS 2237, *2 (D.C. Cir. Jan. 31, 2025) (denial of rehr'g en banc) ("The panel unanimously ruled in favor of the challenge in this case on an entirely separate ground…meaning that the panel majority's rejection of the CEQ's authority to issue binding NEPA regulations was unnecessary to the panel's disposition.") (citations omitted).
[96] *See generally* 43 U.S.C. § 1701; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (describing FLPMA's sweeping multiple use mandate).
[97] 43 U.S.C. § 1732(b) (emphasis added).
[98] *See Norton*, 542 U.S. at 58.
[99] 43 C.F.R. § 8342.1.
[100] *Compare* 43 U.S.C. § 1701(a)(8) *with* 43 C.F.R. § 8342.1.
[101] 43 U.S.C. § 1732(b).

authority, complements FLPMA's broad objectives, and applies them to a specific use on BLM-managed lands.[102]

### C.    NEPA

Plaintiffs have similarly failed to demonstrate that they are likely to succeed on their claim that BLM violated NEPA by declining to prepare an EIS. An agency's decision to rely on an EA and a FONSI rather than an EIS "is a factual determination which implicates agency expertise and, accordingly, is reviewed under the deferential arbitrary and capricious standard of review."[103]

Plaintiffs allege that BLM was required to analyze the San Rafael Swell TMP's environmental impacts in an EIS rather than an EA, and that BLM's failure to do so violated NEPA's "hard look" standard.[104] However, because Plaintiffs fundamentally misunderstand the difference between NEPA's "hard look" and "significant effect" standards, they have not demonstrated that they are likely to prove the San Rafael Swell TMP significantly affects the environment.

### 1.    *Plaintiffs conflate NEPA's "hard look" and "significant effect" standards.*

Although NEPA's "hard look" and "significant effect" standards are both integral to the statute's objective of ensuring informed decision-making, they serve different purposes. The "hard look" requirement mandates that federal agencies thoroughly examine the environmental

---

[102] *See Utah Shared Access All.*, 463 F.3d at 1130, 1136 (observing that 43 C.F.R. § 8342.1 was promulgated in part to implement FLPMA and holding that applying the minimization criteria "is a lawful discharge of the BLM's duty…to prevent undue degradation of resources").

[103] *Utah Shared Access All. v. U.S. Forest Serv.*, 288 F.3d 1205, 1213 (10th Cir. 2002) (citation omitted).

[104] Mot. 15-16.

consequences of proposed actions.[105] When reviewing agency actions under NEPA, courts

consider whether the agency has taken this "hard look" by deciding whether the agency has

adequately "disclosed the environmental impact of its actions and [whether] its decision is not

arbitrary or capricious."[106] In short, the "hard look" standard pertains to the thoroughness and

reasonableness of the agency's environmental review process.

On the other hand, the "significant effects" standard (*i.e.*, the requirement to issue an EIS)

is specifically tied to the substantive outcomes of the agency's decision and the degree and

significance of the action's environmental impacts.[107]

Plaintiffs argue that BLM "abandoned its duty to take a 'hard look' by failing to create an

[EIS], in violation of [NEPA]."[108] According to Plaintiffs, BLM erred in issuing the San Rafael

Swell FONSI because BLM "cherry-picked evidence to fit their narrative" that the TMP would

not harm the human environment, despite "the sheer amount of public input BLM received from

various motorized recreational groups."[109] But this argument confuses NEPA's "hard look" and

"significant effect" requirements and improperly collapses the two distinct requirements into

one.

As Plaintiffs acknowledge, BLM spent a considerable amount of time inventorying

---

[105] *Robertson*, 490 U.S. at 349.

[106] *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983); *Conner*, 920 F.3d at 1257 (an agency has taken a hard look when "its method of analyzing environmental effects 'had a rational basis and took into consideration the relevant factors.'") (citation omitted).

[107] *Ctr. for Biological Diversity*, 72 F.4th at 1187-88 ("An agency may issue a FONSI only if, after reviewing the direct and indirect effects of a proposed action, it concludes that the action will not have a significant effect on the human environment....The significance of an impact is determined by the action's context and its intensity.") (citations omitted).

[108] Mot. 15.

[109] *Id.* at 16.

routes; creating individual route reports that evaluated the natural, <u>recreational</u>, cultural, and historical values of each route; and analyzing that information and information from the public to develop the route rationales that support BLM's decision to open, close, or limit each route to OHVs.[110] But BLM's significant efforts do not equate to a significant effect on the environment. BLM was not required to prepare an EIS merely on the grounds that the San Rafael Swell EA did not incorporate input from various motorized recreation groups to the extent Plaintiffs deem satisfactory.

> 2. *Plaintiffs have not demonstrated they are likely to prove the San Rafael Swell TMP significantly affects the environment.*

As explained above, an EIS is required if a major federal action may have a significant effect on the environment. "The significance of an impact is determined by the action's context and its intensity."[111] "The decision not to prepare an EIS is only improper if the [plaintiffs] can demonstrate substantively that the agency's conclusion of non-significant effect on the environment represents a clear error of judgment."[112]

Plaintiffs provide no explanation demonstrating <u>how</u> BLM's reasoning in the San Rafael Swell FONSI is improper. Indeed, Plaintiffs' Motion does not cite to the FONSI, let alone grapple with its reasoning or show how BLM erred in its conclusion that an EIS was unnecessary.[113] Consequently, Plaintiffs have not substantively demonstrated how they are likely

---

[110] *Id.*

[111] *Ctr. for Biological Diversity*, 72 F.4th at 1187-88; *see also* <u>40 C.F.R. § 1501.3(d) (2024)</u> ("In considering whether an adverse effect of the proposed action is significant, agencies shall examine both the context of the action and the intensity of the effect.").

[112] *Ctr. for Biological Diversity*, 72 F.4th at 1188-89 (citation omitted).

[113] *See* Mot. 15-17 (citing general NEPA caselaw but providing no explanation of how the FONSI is improper).

to show the FONSI "represents a clear error of judgment" such that an EIS was warranted.[114]

## II.    Plaintiffs Will Not Suffer Immediate and Irreparable Harm

With respect to harm, a plaintiff "must establish . . . that he is likely to suffer irreparable harm in the absence of preliminary relief."[115] Any "speculative or theoretical injury will not suffice."[116] Moreover, preliminary injunctive relief is only necessary if the harm is "likely to occur before the district court rules on the merits."[117] That is, the threat of injury must be "of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm."[118]

Here, Plaintiffs allege they will suffer three types of harm absent some form of preliminary relief: (1) "obliteration" of the routes BLM closed in the San Rafael Swell TMP; (2) Plaintiff Wells' inability to access his "family land"; and (3) Plaintiffs' inability to travel closed routes.[119] As explained below and in the U.S. Opposition, none of these alleged harms are immediate or irreparable.

### A.    "Obliteration" of Closed Routes

Plaintiffs claim that they will be immediately and irreparably harmed because "Defendants will no doubt begin obliterating routes" such that "Plaintiffs will be forbidden from

---

[114] *Ctr. for Biological Diversity*, 72 F.4th at 1188-89.
[115] *Winter*, 555 U.S. at 20.
[116] *Colorado*, 989 F.3d at 884.
[117] *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1250 (10th Cir. 2017) (citation omitted).
[118] *Colorado*, 989 F.3d at 884 (citation omitted).
[119] Mot. 17-19.

ever remaking them."[120] However, Plaintiffs provide no support for their contention that this alleged harm will be either immediate or irreparable.[121]

In fact, the Final EA and DR directly contradict Plaintiffs' claims.[122] The EA's Implementation Guide outlines BLM's anticipated implementation of the TMP as well as strategies, priorities and general timeframes for implementation.[123] The most immediate phase of implementation is "Education and Outreach," which includes updating GIS data and posting an interactive map to BLM's ePlanning website for public use.[124] After this phase, the Implementation Guide discusses things like installing signs for routes, maintaining routes, enforcing route designations, and monitoring routes.[125] The Implementation Guide also discusses "route reclamation," cautioning that "[a]n OHV-Closed designation does not automatically mean that a route will be actively reclaimed."[126] Instead, it details a number of potential options to reclaim closed routes, including allowing natural reclamation, as well as more direct actions like ripping and re-seeding routes.[127] Neither the DR nor the Implementation Guide establishes a specific timeline to take any of these actions, instead stating that "route-specific reclamation strategies will be identified in the future by BLM resource specialists."[128] Nor does either document state that BLM immediately will begin to actively reclaim or "obliterate" routes.

---

[120] *Id*. at 18.
[121] *Id*. at 17-18.
[122] *See* EA at 260-302.
[123] *Id.*
[124] *Id.* at 262-63.
[125] *Id.* at 263-70.
[126] *Id.* at 270.
[127] *Id.* at 270-71.
[128] *Id.* at 270 (emphasis added).

Rather, Plaintiffs merely believe these actions will occur at some point.[129] But, "speculative or theoretical injury" is not sufficient to warrant a stay or preliminary injunction.[130]

### B.    Denied Access to Marsing Ranch

Plaintiffs next claim that Plaintiff Wells will be immediately and irreparably damaged because BLM "cut off all public access to Marsing Ranch" which is a "meaningful piece of [Plaintiff Wells'] family heritage."[131] Plaintiffs do not provide any support for their contention that this harm is irreparable.[132]

As discussed above, BLM has no obligation to provide motorized access to a particular destination. Moreover, Mr. Wells is not cut off from access to the ranch, but rather to the motorized access he would prefer.[133] The ranch is still accessible via non-motorized means. Finally, this purported harm is not irreparable. If Plaintiffs are ultimately successful, Mr. Wells will be able to resume driving the routes to Marsing Ranch.[134]

### C.    Inability to Travel Closed Routes

Finally, Plaintiffs state—though do not meaningfully argue—that they "will no longer be able to travel the routes as they had planned."[135] As with the other alleged harms, this harm is not irreparable. Irreparable harm only occurs "if the district court cannot remedy [the injury]

---

[129] *See also BlueRibbon*, 2024 U.S. Dist. LEXIS 49991 at *30-31 (finding BLM's Labyrinth/Gemini Bridges TMP Implementation Guide, which outlined active reclamation as one option for reclaiming routes, too speculative to substantiate immediate or irreparable injury).
[130] *Colorado*, 989 F.3d at 884.
[131] Mot. 18.
[132] *Id.* at 18-19.
[133] *See* U.S. Opp'n 8-9; *supra* at 15.
[134] *See BlueRibbon*, 2024 U.S. Dist. LEXIS 49991, at *31-32.
[135] Mot. 17.

following a final determination on the merits."[136] But "recreationists do not have a legally cognizable interest in using a particular route on a particular date."[137] Further, "Plaintiffs will be able to resume driving the routes at a later date" if they are successful in the litigation on the merits.[138] In the meantime, Plaintiffs are able to drive the 1,496 miles of routes within the TMP that BLM did not close to motorized vehicle use.

### III.    Injury to SUWA's Interests Outweighs Any Injury to Plaintiffs

Even if a plaintiff is able to demonstrate immediate and irreparable harm from the TMP—which Plaintiffs have failed to do here—preliminary relief is only appropriate if their injuries outweigh the harm to the defendants. When deciding whether to grant preliminary relief, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."[139] Importantly, environmental injuries are usually "of an enduring or permanent nature . . . and generally considered irreparable," tipping the balance in favor of preventing environmental harm.[140]

Here, Plaintiffs have failed to establish that the potential harm of leaving BLM's decision in place outweighs the harm to SUWA if preliminary relief is granted. Plaintiffs claim that they will suffer irreparable harm because the closed routes will be "obliterated," Plaintiff Wells is not able to access Marsing Ranch, and Plaintiffs and their members will be unable to drive the closed roads during the pendency of the litigation. With regard to Plaintiffs' inability to drive the closed

---

[136] *Fish v. Kobach*, 840 F.3d 710, 751 (10th Cir. 2016) (internal quotation marks and citation omitted).
[137] *BlueRibbon*, 2024 U.S. Dist. LEXIS 49991, at *32.
[138] *Id.*
[139] *Winter*, 555 U.S. at 24 (internal quotation marks omitted).
[140] *Catron Cnty. Bd. of Comm'rs v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1440 (10th Cir. 1996) (citation omitted).

routes, this harm is outweighed by the documented harm to public lands and resources if OHV use resumes. Such use also harms SUWA's members who wish to see these resources protected from motorized use and damage.[141] With regard to Plaintiffs' claim that closed routes will be obliterated, as discussed above, these alleged harms are speculative, unsupported, and contrary to the record.

Moreover, Plaintiffs assert that there will be no harm to the other parties because "[t]hese routes have been open for close to two decades with no issues."[142] Plaintiffs do not cite to any support for this contention.[143] But a delay in the TMP's effective date does impose a real threat of harm to the environment because motorized use would resume on closed routes. The EA and DR outline the significant damage to resources that OHV use has caused and would continue to cause if left unabated in the TMA.[144] For example, opening the closed routes during the pendency of the litigation would:

- Fragment and degrade important habitat for species;[145]

- Increase soil erosion and damage to vegetation;[146] and

- Revive impacts to riparian areas.[147]

All told, the significant threat of harm to the environment if an injunction were granted outweighs the minimal harm to Plaintiffs of being deprived of the opportunity to drive certain

---

[141] *See* SUWA Mot. to Intervene, Ex. 1, Decl. of Ray Bloxham ¶¶ 13-17, ECF No. 10-1.
[142] Mot. 19.
[143] *Id.*
[144] *See generally* EA at 36-137; DR at DR-26.
[145] *See, e.g.*, DR at DR-32, -35, -44, -46, -49, -50, -56, -59, -65, -72, -75, -76, -77, -79, -80, -82, -84, -92, -98, -99, -101, 104, -479, -543.
[146] *See, e.g.*, DR at DR-32, -35, -44, -46, -49, -50, -56, -59, -72, -75, -76, -77, -79, -80, -82, -84, -92, -98, -99, -101, -102, -104, 479, -543.
[147] *See, e.g.* DR at DR-44, -46, -50, -56, -75, -80, -82, -543.

motorized routes while the case proceeds.[148]

## IV.    The Public Interest Favors Denying Preliminary Relief

A decision to grant Plaintiffs' Motion is decidedly not in the public interest. The public

has a strong interest in "preservation of the natural environment" and the protection of federal

public lands and resources.[149] As with the other factors necessary to obtain emergency injunctive

relief, it is Plaintiffs' burden to meet this prong of the test.

Plaintiffs claim that the public interest favors an injunction for three reasons: (1) closing

routes "will have a significant impact on the public's ability to continue their enjoyment of this

public land;" (2) legislation has been introduced to "prohibit federal money from being used to

enact new travel plans;" and (3) it is in the public interest to "hold BLM accountable with

applicable law."[150] Each of these rationales fail.

*First*, providing for the public's access to and enjoyment of public lands does not equate

to ensuring motorized access.[151] BLM has a statutory obligation, and consequently broad

discretion, to manage public lands in a manner that balances accessibility and recreation with

resource conservation.[152] It is thus in the public interest to leave in place decisions that strive to

---

[148] *Cf. Am. Motorcyclist Ass'n v. Watt*, 534 F. Supp. 923, 937 (C.D. Cal. 1981) *aff'd* 714 F.2d 962 (9th Cir. 1983) (explaining that deprivation of some motorized recreation opportunities during the pendency of litigation did not outweigh the threat of harm to the desert from that recreational use).

[149] *Nat'l Wildlife Fed'n v. Andrus*, 440 F. Supp. 1245, 1256 (D.D.C. 1977); *see also Colo. Wild v. U.S. Forest Serv.*, 299 F. Supp. 2d 1184, 1190-91 (D. Colo. 2004) ("[t]here is an overriding public interest in the preservation of biological integrity and the undeveloped character of the . . . area").

[150] Mot. 19-20.

[151] *Cf. Colo. Wild v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1222-23 (D. Colo. 2007) (observing that limiting modes of access to a location may be categorized as an "inconvenience" but does not amount to a deprivation of access).

[152] *See* 43. U.S.C. § 1701 (a)(8).

achieve this balance.

*Second*, the "Historic Roadways Protection Act" was specifically introduced in response to the 2023 Labyrinth/Gemini Bridges TMP[153] to directly support <u>Plaintiffs'</u> interests in expanded motorized vehicle use, not the general public's interests.[154] Plaintiff BlueRibbon Coalition proudly admits as much, explaining that

> elected leaders in Utah reached out to see what they could do to help roll back this shutdown of Utah's public lands. We educated their staff about the problems we are seeing with these travel plans, and in response they introduced the Historic Roadways Protection Act.[155]

But Plaintiffs have not explained how this proposed legislation supports an assertion that the public interest favors <u>preliminary</u> injunctive relief, especially when that same relief (reopening closed routes) could be granted at the end of the litigation if Plaintiffs are successful on the merits.

*Finally*, while it is true that it is within the public's interest that BLM comply with applicable law, as explained above, it is highly unlikely that Plaintiffs have identified legal error in the San Rafael Swell TMP's EA and DR that suggests BLM did not comply with all

---

[153] The Labyrinth/Gemini Bridges TMP, finalized in September 2023, governs motorized vehicle use in Labyrinth/Gemini Bridges TMA, just north of Moab, Utah. Plaintiff BlueRibbon Coalition is currently litigating that plan. *See generally* <u>*BlueRibbon Coal. v. Bureau of Land Mgmt.*, 2:23-cv-00923-DAK-JCB (D. Utah)</u>.

[154] *See generally* <u>Historic Roadways Protection Act</u>, S. 90, H.R. 376, 119th Cong. (2025).

[155] BlueRibbon Coalition, <u>*ALERT: Historic Roadways Protection Act Reintroduced – Needs Your Support*</u>, BlueRibbon Coalition (Jan. 16, 2025) (attached as Ex. 2).

applicable laws.[156]

## <u>CONCLUSION</u>

In sum, Plaintiffs have failed to meet all four factors necessary to warrant preliminary

relief. Thus, for the foregoing reasons, the Court should deny the Plaintiffs' Motion for Relief

Under 5 U.S.C. § 705 or, Alternatively, for a Preliminary Injunction.


Respectfully submitted April 10th, 2025.


*/s/ Hanna Larsen*
Stephen Bloch
Laura Peterson
Hanna Larsen

*Attorneys for Proposed Defendant-Intervenor*
*Southern Utah Wilderness Alliance*

---

[156] *See supra* Argument § I.

### CERTIFICATE OF COMPLIANCE

I hereby certify that this memorandum contains 7,714 words (excluding the caption, table contents, table of authorities, and signature block) and complies with the DUCivR 7-1(a)(4)(C). I obtained the word count using Microsoft Word.

*/s/ Hanna Larsen*
Hanna Larsen