Isabella Eldridge (Utah Bar No. 19517)
BLUERIBBON COALITION, INC
800 W Main Street, Suite 1640
Boise, ID 83702
Telephone: (405) 464-9060
Email: bella.eldridge@blueribboncoalition.org

*Attorney for BlueRibbon Coalition, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH
### CENTRAL DIVISION, SOUTHERN REGION

| | |
|---|---|
| BLUERIBBON COALITION, INC. *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. BUREAU OF LAND MANAGEMENT, *et al.*, <br><br> Defendants, <br><br> and <br><br> SOUTHERN UTAH WILDERNESS ALLIANCE, <br><br> Defendant-Intervenor. | Case No. 4:25-cv-00022-DN <br><br> **PLAINTIFF'S REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR RELIEF UNDER 5 U.S.C. § 705, OR, ALTERNATIVELY, FOR A PRELIMINARY INJUNCTION** <br><br> District Judge David Nuffer |

Plaintiffs hereby offer this Reply to Defendants' Opposition to Motion for Preliminary Injunction. ECF No. 21, and Defendant-Intervenor's Response and Memorandum in Opposition to Plaintiffs' Motion for Relief Under 5 U.S.C. § 705 or, Alternatively, for a Preliminary Injunction, ECF No. 24. As shown below, Plaintiffs are likely to succeed on the merits of their challenge to Defendants' closure of over 660 miles of trails in Emery County, Utah. The closures violate the

1

Dingell Act, are arbitrary and capricious, and violate the National Environmental Policy Act ("NEPA").

Moreover, once these routes are closed, they naturally begin to overgrow and are subject to irreversible measures like ripping and re-seeding. The creation of new routes is unlawful, and to Plaintiffs' knowledge, Defendants have never reestablished a route once it has vanished due to closure. Further, Paul Wells can no longer access his family homestead due to route closures by Federal Defendants. This outcome exemplifies a clear case of irreparable harm, with public interest strongly favoring the continued openness of the routes, as detailed in Sections II and III below.

## I.     PLAINTFFS ARE LIKELY TO SUCCEED ON THE MERITS

### a.   *Plaintiffs are likely to succeed on their Dingell Act claim.*

A straightforward review of the maps attached to the original complaint[1] leaves little room for doubt: BLM's intent to create buffer zones around Sid's Mountain Wilderness, Mexican Mountain Wilderness, and Devil's Canyon Wilderness is unmistakable. The pattern and placement of route closures are so apparent that the creation of *de facto* buffer zones can hardly be viewed as anything but deliberate. Despite this, Defendant-Intervenor claims "BLM designated many routes for motorized use that border wilderness areas, lead to wilderness areas, or are in close proximity to them." ECF No. 24 at 10. And as such ". . . BLM did not create a buffer zone around wilderness." ECF No. 24 at 11.

Assuming arguendo this rationale is correct, it still fails to refute the creation of a buffer zone. Defendant-Intervenor's argument hinges on the erroneous assumption that a buffer zone can only exist through complete closure of all routes in the area. This interpretation finds no support in the plain language of the Dingell Act, which prohibits *any* management action that

---

[1] *See* Compl. ¶ 37., ECF No. 1

effectively expands wilderness boundaries beyond what Congress explicitly authorized: "Congress does not intend for the designation of the wilderness to create protective perimeters or buffer zones around the wilderness areas."[2] And, "[t]he fact that nonwilderness activities or uses can be seen or heard from areas within a wilderness area shall not preclude the conduct of those activities or uses outside the boundary of the wilderness area."[3]

Furthermore, Defendant-Intervenor attempts to dismiss Plaintiffs' argument that the closure of Route SS3115 is a covert attempt to expand wilderness protections by pointing to the BLM's failure to explicitly state wilderness as the reason for the closure. ECF No. 24 at 12. However, Plaintiffs' position is that the continued allowance of only horseback riding and hiking—uses exclusively permitted within designated wilderness—strongly suggests an intent to manage the area as wilderness. Defendant-Intervenor's reliance on alternative justifications for the closure is irrelevant to this point, as the practical outcome aligns with wilderness expansion, regardless of the BLM's stated rationale. Likewise, their assertion that "BLM's analyses of routes SS2174B, SS2176B, SS2182, and SS186 do not demonstrate any intent to create or the creation of a wilderness buffer", *id.*, is directly contradicted by BLM's own explanations–cited in Plaintiffs' motion–which explicitly state that the closures were intended to deny and impair access to nearby wilderness areas.[4]

Defendant-Intervenor also argues that because "[] all 14 wilderness areas within the TMA are bordered at least in part by a route open to OHV use," no buffer zones were created. ECF No. 24 at 10. However, this reasoning is flawed for the same reason discussed above: the presence of some open routes does not negate the creation of buffer zones elsewhere. Furthermore, motorized

---

[2] *See* 16 U.S.C. § 1232(e)(1).
[3] *See id* at § 1232(e)(2)
[4] Pls.' Mot. for Prelim. Inj., ECF No. 4 at 9,10.

routes are routinely used to delineate and "cherry-stem" corridors through designated wilderness, such that the wilderness boundary terminates at the edge of the route corridor. Whether a route lies immediately adjacent to a wilderness area is secondary to the broader question of whether a large, contiguous landscape is managed under wilderness-level restrictions. Here, each of the three buffer zones identified by Plaintiffs achieves precisely that result. By eliminating motorized access, they effectively extend wilderness-level protections into adjacent roadless areas. If this management approach does not constitute the creation of a buffer zone, it is difficult to understand what would.

The Court should give effect to Congress's plain directive that designated wilderness areas not be impermissibly expanded and hold that Plaintiffs are likely to win on the merits of this claim.

      b. *Plaintiffs are likely to succeed on their Arbitrary and Capricious claim.*

Defendant's application of the Federal Land Policy and Management Act ("FLPMA") was arbitrary and capricious. Specifically, the agency failed to consider critical aspects of the TMP and provided justifications that contradict the record evidence. *W. Watersheds Proj. v. Haaland*, 69 F.4th 689, 700 (10th Cir. 2023). Additionally, BLM's failure to address relevant and significant public comments further demonstrates that its decision "was not based on a consideration of relevant factors." *Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014).

Both Defendants and Defendant-Intervenors deny that the closure of routes providing direct access to the historic Marsing Ranch constitutes arbitrary decision-making. They further contend that the denial of motorized access to Mr. Wells does not amount to irreparable harm, asserting that "Mr. Wells may utilize non-motorized means to access the property." ECF No. 24

at 15. This argument is based on Mr. Wells's statement that historic access to the site was, at times, achieved by horseback. ECF No. 1-1 at 16, 17. However, the mere availability of horseback and hiking access does not alter the analysis. Mr. Wells has relied on these singletrack routes for motorized access to his family site for decades, and the suggestion that he simply resort to horseback or foot travel is both dismissive and unreasonable. Requiring an individual to purchase and maintain a horse imposes an undue burden, and non-motorized access by foot is impractical given the significant distance and challenging terrain of these routes.

Moreover, the four routes identified by BLM as alternative access points to the Marsing Ranch exemplify arbitrary and capricious decision-making.[5] None provide direct access to the site, and the route deemed most viable—SS1001—is "a road cut into the side of the mountain that is extraordinarily high above [] where the ranch is located." Declaration of Ben Burr, attached as Exhibit A, at ¶ 2. Accessing the ranch via SS1001 "requires individuals to descend a steep, unstable slope of loose rock," followed by navigating "a sheer cliff... necessitating technical climbing or rappelling to reach the river below." *Id*. Finally, "one would have to cross the river to get to the historic ranch." *Id. See* Photo 1 in Exhibit A. Accordingly, the claim that these alternative routes adequately mitigate the access issue is illogical and underscores the arbitrary nature of BLM's decision-making.

Further, Defendant-Intervenor asserts there "was no need for BLM to explain" why Principal Deputy Assistant Secretary Steven Feldgus signed the TMP, depriving Plaintiffs access to the IBLA. ECF No. 24 at 16. They claim such authority is inherent within the Department's organizational structure and "no explanation regarding the choice of signatory [] is necessary." ECF No. 24 at 16, 17. Defendants notably declined to address this issue. This position contrasts

---

[5] The routes are SS1234A, SS1403, SS1001, and SS1547B.

sharply with their argument in the *Labyrinth/Gemini Bridges*[6] case, where Defendants emphasized the importance of IBLA review, stating that "[t]he mere availability of such additional review before officers within the Department of the Interior is arguably sufficient to address Plaintiffs' challenge..."[7] And that "[T]he opportunity to seek 'appellate' review of the TMP before the IBLA 'further ensures political accountability'. . ."[8] Defendant-Intervenor incorporated this argument in its briefing in that case, signaling its agreement with the principle then asserted by Defendants.[9]

Defendants and Defendant-Intervenor's inconsistent position regarding IBLA review underscores the arbitrary nature of having Steven Feldgus sign the TMP. Also, given the implausibility of the alternative routes to the Marsing Ranch, Defendants failed to consider key aspects of the TMP and offered justifications that contradict the on-the-ground reality. Accordingly, Plaintiffs are likely to prevail on the merits of this claim.

       c.  *Plaintiffs are likely to succeed on their NEPA claim.*

Defendant's failure to apply any sort of "hard look" as required by the National Environmental Protection Act ("NEPA") is evident by its failure to provide specificity for closing routes. Rarely did the DR provide anything more than "general statements" *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011). And yet, the entire purpose of NEPA is to provide an "accurate scientific analysis" so that the public can scrutinize the information before actions are taken. *Ctr. for Biological Diversity v. USFS*, 349 F.3d 1157, 1167 (9th Cir. 2003).

---

[6] *See BlueRibbon Coalition, Inc. v. U.S. Bureau of Land Mgmt.,* No. 2:23-CV-923-DAK-JCB, 2024 WL 1197862 (D. Utah Mar. 20, 2024).
[7] *Id*. ECF No. 78 at 12.
[8] *Id.*
[9] *Id.* ECF No. 79 at 10.

6

Defendants also failed to argue that the TMP does not constitute major federal action that would necessitate an involved and time-consuming environmental impact statement.[10] When the federal government initiates an action itself, rather than merely approving a third-party action, it is more likely to qualify as a major federal action. *See Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1244-45 (D.C. Cir. 19080).

That is precisely the case here, where BLM is not merely a passive approver but the primary actor and decision-maker in executing the route closures. Defendants financed the TMP, directed its research, and are solely responsible for its implementation. This includes the closure of hundreds of miles of routes, enforcement and monitoring, physical obliteration of roads, installation of signage, production of maps, ongoing biological and environmental research, and the full range of regulatory activities required to manage 1,149,016 acres of public land. The TMP constitutes a major federal action with significant effects on the human environment and therefore requires an Environmental Impact Statement under NEPA. As such, Plaintiffs are likely to win on the merits of this claim.

## II. PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF IRREPARABLE INJURY.

Defendants and Defendant-Intervenor entirely dismiss the irreparable harm suffered by Plaintiff Paul Wells, who has been effectively denied access to his family homestead. As the Tenth Circuit made clear in *Colo. v. U.S. Env't Prot. Agency*, 989 F.3d 874, 884 (10th Cir. 2021), "a speculative or theoretical injury will not suffice in establishing irreparable harm." Mr. Wells' injury is neither speculative nor theoretical. The alternative routes identified by BLM, as discussed above, are wholly impractical. Moreover, Defendants' assertion that "the alleged injury is not irreparable because deprivation of OHV access does not affect family heritage" and that "Mr. Wells does not

---

[10] *See* 42 U.S.C. § 4332(c).

state that he is incapable of accessing the Marsing Ranch . . . through some non-motorized form of access" reflects a dismissive and narrow view of the actual harm imposed. ECF No. 21 at 8, 9.

Furthermore, Defendant-Intervenor asserts that the "final EA and DR directly contradict Plaintiffs' claims" regarding obliteration of closed routes. ECF No. 24 at 23. And that no "specific timeline" was created regarding route-reclamation strategies. The fact that BLM has not set a specific timeline[11] for reclamation does not diminish the legal impact of the closures, which are effective immediately. Nor does the suggestion that reclamation "may" occur in the future alleviate Plaintiffs' concerns—particularly where the Implementation Guide openly contemplates irreversible measures like ripping and re-seeding. The mere assertion that such actions might take place later does not prevent them from happening immediately, especially in the absence of any binding limitations or safeguards.

Additionally, despite Defendants' insistence that routes can be reopened or expanded, they fail to point to one instance of that happening in any meaningful way. ECF No. 21 at 7, 8; ECF No. 24 at 22-24. Finally, illegal closures that restrict Plaintiffs' freedom to travel on desired routes constitute irreparable harm.

### III. THE PUBLIC INTEREST ALIGNS WITH ENJOINING UNLAWFUL REGULATIONS.

Defendant-Intervenor argues that injunctive relief "is decidedly not in the public interest." ECF No. 24 at 27. But it is Plaintiff who must establish that "the injunction would not be adverse to the public interest." *Fish v. Kobach*, 840 F.3d 710, 723 (10th Cir. 2016) (quotation omitted). Plaintiffs must also show that their "threatened injury outweighs the injury the opposing party will suffer under the injunction." *Id*. Plaintiffs have shown both. It is also in the

---

[11] *See* EA at 270: "route-specific reclamation strategies will be identified in the future by BLM resource specialists."

public interest to "maintain the status quo and avoid the implementation of agency action which was likely promulgated in excess of statutory authority." *Wyoming v. United States DOI*, 136 F. Supp. 3d 1317, 1351 (D. Wyo. 2015).

Moreover, Defendant-Intervenor contends that the introduction of the Historic Roadways Protection Act ("HRPA")[12] only "support[s] Plaintiffs' interests . . . not the general public's interest." ECF No. 24 at 28. They subsequently cited a portion of text from Plaintiff BlueRibbon's Action Alert in support of their argument, which described how "elected leaders in Utah reached out [to BRC] to see what they could do to roll back this shutdown of Utah's Public lands . . ."[13] And after some discussion, the elected leaders chose to introduce HRPA. So the assertion that HRPA serves only Plaintiffs' interests is unfounded, as it was elected officials who proactively reached out to Plaintiffs, underscoring that this effort is rooted in broad public interest, not private gain.

In contrast, Defendant-Intervenor has for decades relied on America's Red Rock Wilderness Act ("ARRWA")—a proposal that has been introduced repeatedly for over 35 years yet has never garnered enough support to pass a single time. Despite this total lack of legislative success, Defendant-Intervenor asserts "For over 35 years, this bill has served many purposes—as our vision for public lands in Utah, as a negotiating tool for successful legislation and new wilderness designation, [and] as the basis for administrative protections. . ."[14] Setting aside the concerns raised by this comment, as an unpassed legislative proposal should not serve as the

---

[12] *See generally* https://www.congress.gov/bill/119th-congress/senate-bill/90/text S. 90, H.R. 376, 119th Cong. (2025).
[13] BlueRibbon Coalition, https://blueribboncoalition.org/alert-historic-roadways-protection-act-reintroduced-needs-your-support/ BlueRibbon Coalition (Jan. 16, 2025).
[14] Southern Utah Wilderness Alliance, "With attacks on public lands coming from both the White House and a hostile Congress …" (Mar. 28, 2025) Posted on Southern Utah Wilderness Alliance, online: *Facebook* www.facebook.com/SouthernUtahWildernessAlliance

9

basis for any decisions, Defendant-Intervenor's attempt to discredit Plaintiffs' reliance on a newly introduced, but publicly supported, piece of legislation—while simultaneously anchoring its own agenda to a perpetually unpassed proposal—is fundamentally contradictory. Unlike Defendant-Intervenor's aspirational reliance on ARRWA, Plaintiffs' position responds to genuine public concerns and is supported by engagement from elected representatives of the affected district.

As such, granting Plaintiffs' Motion would merely maintain the status quo of the TMA as established under the 2008 RMP. Any potential harm to Defendants or Defendant-Intervenor would be minimal. For Plaintiffs, however, the harm is obvious. Plaintiff Paul Wells has been personally impacted by the route closures and can no longer visit his family homestead, the Marsing Ranch. ECF No. 1-1 at 15, 16. Plaintiff BlueRibbon has members who regularly traveled the now-closed routes, and public favor overwhelmingly favors an injunction.

## CONCLUSION

Plaintiffs have satisfied the requirements for relief under 5 U.S.C. § 705, or, in the alternative, for issuance of a preliminary injunction. They have demonstrated a strong likelihood of success on the merits, are threatened with irreparable harm due to Paul Wells' denial of access to his family homestead along with the imminent destruction of routes and have shown that the equities weigh in their favor. Moreover, the requested relief serves the broader public interest. The Court should grant Plaintiffs' Motion, ECF No. 4.

Dated this 24th day of April 2025.

BLUERIBBON COALITION, INC.

*/s/ Isabella Eldridge*
Isabella Eldridge
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of April 2025, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court for the District of Utah by using the CM/ECF system, which will serve a copy of the same on all counsel of record.

/s/ *Isabella Eldridge*
Isabella Eldridge